UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 1:18-CV-20283

ENRIQUE IGLESIAS, an individual,

        Plaintiff                      **JURY TRIAL DEMANDED**

v.

UNIVERSAL INTERNATIONAL MUSIC,
BV, a Dutch corporation,

        Defendant.
_____/

## **COMPLAINT**

Plaintiff, Enrique Iglesias ("Iglesias"), through counsel, hereby files the following complaint against the defendant, Universal International Music B.V. ("Universal") and states as follows:

### I.     INTRODUCTION

1. Renowned musical artist Iglesias entered a recording agreement with Universal. In fully performing his contractual obligations to Universal, Iglesias achieved rarefied commercial benchmarks: topping the *Billboard* Latin Chart with his twenty-seventh No. #1 single (more than double those of any other artist); surpassing Prince and Michael Jackson as the male performer with the most No. #1 dance singles; starring in the tenth most-watched video in YouTube™ history (*Bailando*, with more than 2.459 billion views); performing at the Super Bowl Halftime show; selling over 100 million albums; and generating billions of streams. Despite Iglesias' record-breaking success, Universal has refused to reciprocate and breached its contractual obligations to Iglesias.  Specifically, Universal has been systematically underpaying

Iglesias' streaming royalties by calculating those royalties at a small fraction of the contractually-required fifty percent (50%) royalty rate. Universal's inaccurate financial statements characterize Iglesias' account as being *un-recouped* millions of dollars even though Iglesias has generated sales of a magnitude rarely attained in the music industry. Universal's numbers are so distorted that Iglesias demanded to exercise his contractual right to inspect Universal's books. Universal refused. Iglesias has exhausted non-judicial efforts to ascertain the true story and get paid fairly. Iglesias respectfully asks this Court to enforce the contract's fifty percent (50%) streaming royalty rate, order a fair accounting of royalties earned by Iglesias, and award Iglesias the royalties which Universal has refused to acknowledge or pay.

## II.   PARTIES, JURISDICTION AND VENUE

**A.   The Parties**.

2.   Plaintiff Iglesias is a recording artist internationally-renowned among both English and Spanish-speaking audiences. Since the launch of his career in 1995, the Spanish-born, American-reared Iglesias has released ten (10) studio albums (plus two greatest hits compilations), sold over one hundred million copies of those albums, performed live before more than ten million fans, generated multiplatinum sales in scores of countries, won multiple Grammy awards, and earned a ranking among music history's greatest selling artists.

3.   Defendant Universal is a Dutch corporation with its principal place of business in the Netherlands. Universal produces music which it distributes worldwide and throughout the United States, the State of Florida, and Miami-Dade County.

**B.   Jurisdiction and Venue**.

4.   At all relevant times, Universal has actively, regularly, systematically and continuously conducted business in the State of Florida and is, therefore, subject to the

jurisdiction of this Court. Further, this lawsuit arises from Universal's activities in the State of Florida, including the breaches of its contractual obligations.

5. Alternatively, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because at all pertinent times Iglesias has been a citizen of Florida and Universal has been a citizen of the Netherlands (Universal), and the matter in controversy exceeds $75,000.00, exclusive of attorneys' fees and costs.

6. This Court has personal jurisdiction over Universal because Universal conducts business in the State of Florida and the Southern District of Florida through the sale, marketing, promotion and distribution of musical works through a variety of different media.

7. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b)(1) and 1400(a) because Universal is subject to personal jurisdiction in this district and therefore "resides" in this district, as that term is defined in 28 U.S.C. § 1391(c). Venue is further proper pursuant to 28 U.S.C. § 1391(b)(2) as the disputed account statements were tendered by Universal to Iglesias in this district, and the payments/credits due to Iglesias should have been paid in this district.

8. All conditions precedent to the prosecution of this action have been satisfied, fulfilled, extinguished, waived or otherwise executed.

### III. FACTUAL BACKGROUND

**A. Iglesias Debuts with Back-to-Back-to-Back Multi-Platinum Albums**.

9. Iglesias' musical career commenced in 1995 with the debut of the eponymously-titled album, *Enrique Iglesias.* Released by the independent label Fonovisa Records ("Fonovisa"), *Enrique Iglesias* sold more than six million (6,000,000) copies, went platinum in both Spain and the United States, and netted Iglesias a string of industry accolades, including

"Best Latin Performer," "Artist of the Year," and a Grammy for "Best Latin Pop Album." Five of the album's singles including *Por Amarte*, *No Llores Por Mi* and *Trapecista* topped the *Billboard* Latin Charts.

10. Iglesias' follow-up album, *Vivir* ("To Live"), was released in 1997. Three of *Vivir's* tracks, *Enamorado Por Primera Vez*, *Soló en Ti* and *Miente*, ascended to the top of the Latin singles charts. *Vivir* sold more than five million (5,000,000) copies, went platinum, was nominated for a Grammy (Best Latin Pop Album), and fueled Iglesias' first world tour performing to sold-out stadiums alongside Elton John, Bruce Springsteen and Billy Joel.

11. Iglesias released in 1998 his third and final Fonovisa album, *Cosas Del Amor* ("Things of Love"), which contained the chart-topping singles *Esperanza* and *Nunca Te Olvidare*.[1] *Cosas Del Amor* was nominated for a Grammy (Best Latin Pop Album) and generated such broad appeal that Iglesias distinguished himself as the first artist to top the Hot 100 Dance/Club, Hot Latin Tracks, and Latin 50 album charts simultaneously. Subsequently, Iglesias won an American Music Award for Favorite Latin Artist Performance.

12. Iglesias' three Fonovisa albums collectively sold more than seventeen million (17,000,000) Spanish-language albums. Additionally, by contributing *Bailamos* to the soundtrack of Will Smith's film *Wild Wild West*, Iglesias reached No. #1 in the United States.

**B.     Universal Woos and Contracts with Iglesias: the 1999 Universal Agreement.**

13. The expiration of Iglesias' three-album deal with Fonovisa, together with the success of *Bailamos*, made Iglesias the subject of a bidding war among rival music labels. Based in part on the strength of the pitch by Jimmy Iovine, an executive at Interscope Records ("Interscope"), Iglesias signed a multi-album deal by which Universal and Interscope were to

---

[1] Fonovisa subsequently released greatest hits and remix albums.

record and distribute Iglesias' albums throughout "the Universe," with Universal responsible for his Spanish-language albums and Interscope responsible for his English-language albums.

14.  On May 20, 1999, Iglesias simultaneously entered into parallel recording agreements with Universal and Interscope. (Partially redacted copies of the 1999 Agreements with Universal ("Universal Agreement") and Interscope ("Interscope Agreement") (collectively, the "1999 Agreements") are respectively attached hereto as **Exhibits 1** and **2**).[2] The 1999 Agreements were intertwined in several material ways, permitting for cross-collateralization and conditioning the satisfaction of Iglesias' contractual obligations upon the delivery of a total number of albums under the two 1999 Agreements.

15.  Pursuant to the Universal Agreement, Iglesias committed to delivering a minimum of two Spanish-language albums to Universal, as well as three newly-recorded singles for a "Greatest Hits Album." (*See* Exhibit 1 at ¶ 2(a)). The Universal Agreement provided mutual options for potential third and fourth albums which, dependent upon the success of the first two albums, could morph into a unilateral option for Universal to exercise. (*Id.*).

16.  The Interscope Agreement similarly obligated Iglesias to deliver two English-language albums to Interscope, as well as three newly-recorded singles for a "Greatest Hits Album." As was the case with the Universal Agreement, the Interscope Agreement contained conditional variables that could lead to the creation of additional albums.

**C.  Universal Promises to Pay Iglesias a Fifty Percent (50%) Streaming Royalty Rate**.

17.  In exchange for his commitment to record and deliver the musical works, Iglesias received from Universal recording budgets, recoupable advances, and the right to receive royalty

---

[2] Universal International Records, BV was the original signatory to the 1999 Universal Agreement. However, pursuant to a side letter dated on the same date (May 20, 1999), Universal International Music, B.V. was substituted in Universal International Records, BV's stead. (A true and correct copy of the side letter is attached hereto as **Exhibit 3**).

payments for the monetization of his musical works.[3]  The precise amount of the royalty depended upon the specific geographic territory in which his recordings were sold (*Id.* at ¶ 4) and the manner which his recordings were sold.  (*Id.* at Exhibit A, "Royalties").   By way of example, with respect to any Master Recording:[4]

> (1) leased by Universal or its Licensees to others for their distribution on Phonograph Records in the United States; (2) embodied on Phonograph Records sold by Universal's Licensees in the United States through a direct mail or mail order distribution method (including, without limitation, through so-called 'record clubs'); or (3) embodied on Phonograph Records sold by Universal's Licensees in the United States through retail stores in connection with special radio or television advertisements (sometimes referred to as 'key-outlet marketing'), Universal will pay [Iglesias] fifty percent (50%) of Universal's net receipts with respect to such exploitation.

(Exhibit A to Exhibit 1 at ¶ 1.02(b)).

18.     Paragraph 1(c)(2) provides that "[i]f Universal sells or licenses third-parties to sell Records via telephone, satellite, cable or other direct transmission to the consumer over wire or through the air (e.g., downloading), the royalty rate will be the otherwise applicable royalty rate outlined on paragraph 1.01."   Stated differently, downloads were to be paid at the same rate as the sale of Albums ("Album Royalty Rate").  (*Id.* at ¶ 1.02(c)).

19.     The remainder of Article 1 delineates varying royalty rates applicable to the sale of Budget Records (*id.* at ¶ 1.03), New Medium Records (*id.* at ¶ 1.03(b)(2)), Multiple Record Sets (*id.* at ¶ 1.03(c)), and Phonograph Records derived from Master Recordings furnished by Universal or its Licensees to third parties for the manufacture and distribution of Records outside of the United States.

---

[3] A portion of the royalties derived from the monetization of Iglesias' works were to be applied as credits against the advance(s) paid by Universal to Iglesias.

[4] All capitalized terms not expressly defined herein shall have the meaning ascribed to them in the "Definitions" section of Exhibit A to the 1999 Agreements.

20. Notably, Article I did not prescribe a specific royalty percentage for the "streaming" of Iglesias' works, despite the 1999 Agreements' explicit recognition of this method of distribution.  (*See* Exhibit 1 at ¶ 12, permitting Iglesias to render performances "… on a third party Internet website provided that Artists' performances on his or a third party's website shall be limited to … not more than one live show cybercast (which shall be 'streamed' and not 'downloadable') per year").

21. Paragraph 1.05 of Exhibit A provides:

> If [Universal] authorizes the use of any Master Recording made under this Agreement on a flat fee basis, royalty rate or cent rate basis ***for any type of use not specifically covered else in this Article 1*** … it will credit your royalty account with an amount equal to fifty percent (50%) of its net receipts attributable directly to that use (emphasis added).

(*Id.* at ¶ 1.05) (emphasis added).

22. Given that "streams" were not specifically covered in Article 1, Paragraph 1.05 applies and streams are to be credited at a royalty rate of fifty percent (50%) (hereinafter, "<u>Fifty Percent Streaming Royalty</u>"), which is *significantly higher* than the Album Royalty Rate.

**D.    Universal Promises Iglesias Full and Timely Accounting of Royalties**.

23. Paragraph 3 of Exhibit A obligated Universal to compute the royalties owed to Iglesias as of each June 30 and December 31, or such other semi-annual periods as Universal elected in its sole discretion.  Specifically, within three (3) months following the end of each semi-annual period (*i.e.*, by September 30 and March 31 of each year), Universal was obligated to account to Iglesias for the royalties owed in relation to the preceding semi-annual period.  By no later than September 30 of a specific year, Universal was to render account statements advising Iglesias as to the amount of royalties earned during the first six-month period of the year.  (*See* Exhibit A to Exhibit 1 at ¶ 3.01).

24. Universal was contractually obligated to "maintain books and records which

report the sales or other exploitations of Phonograph Records and Master Recordings hereunder on which royalties are payable to [Iglesias]." (*Id.* at ¶ 3.03).

25.  The Universal Agreement contained several terms designed to curtail Iglesias' accounting right, limiting which individuals could perform the accounting; restricting Iglesias' right of examination to one review per statement, establishing a three-year window to review past statements; and setting a legally unenforceable shortening of the statute of limitations.

**E.  Iglesias Performs His Contractual Duties With Distinction.**

26.  *Enrique*, Iglesias' fourth album and first under Interscope, was released in 1999. While it contained Latin influences, *Enrique* was Iglesias' first full English-language album. The album contained the songs, *Rhythm Divine*, *Could I Have This Kiss Forever* (a duet with Whitney Houston), and *Be With You*, the last of which was nominated for a Grammy (Best Dance Recording).  The album topped the Spanish charts, was certified platinum four times over in Spain, went platinum in the United States, and prompted an invitation to perform at an event regarded as the pinnacle of the entertainment industry – halftime at Super Bowl XXXIV – alongside Christina Aguilera, Phil Collins and Toni Braxton.

27.  *Enrique* reached either gold or platinum sales in thirty-two countries.  In 1999, Iglesias won his first American Music Award for Favorite Latin Artist, an award he would proceed to win six additional times.

28.  In 2001, Iglesias released *Escape*, his second English-language album for Interscope.  The album's first single, *Hero*, hit the airwaves in September of 2001 and serendipitously captured the imagination of listeners grappling with the profound impact of the September 11th terrorist attacks.  *Hero* was played by radio stations with news clips and excerpts of President George W. Bush's address to the nation.  On September 21, 2001, Iglesias

performed *Hero* on *America: A Tribute to Heroes*, a telecast which raised money for United Way's September 11 fund.

29. *Escape* became Iglesias' biggest commercial success to date.  The singles, *Hero*, *Escape* and *Don't Turn Off The Lights* were radio staples and charted both domestically and internationally.  The American Society of Composers and Performers ("ASCAP") recognized *Hero* as the song of the year, while ASCAP reported that the single, *Escape*, was the most performed song of the year.  The album *Escape* was certified platinum in nine different countries, including three times over in the United States and five times over in the United Kingdom.  *Escape* sold more than three and a half million copies in the United States and more than ten million copies worldwide.  Following *Escape*, Iglesias won his third American Music Award for Favorite Latin Artist.

30. In 2002, Iglesias released his first Spanish-language album on Universal, *Quizás* (Perhaps).  *Quizás* debuted at No. #12 on the *Billboard 200* albums chart, the then highest placement of a Spanish-language album.  The album sold a million copies in its first week, making it the fastest selling Spanish album in five years.

31. Three of *Quizás*' singles topped the Latin charts.  *Para Qué La Vida* became the first Spanish-language song to reach a million U.S. radio spins, while the video for the song, *Quizás*, became the first Spanish-language video to be included on MTV's popular show, *Total Request Live*.  Iglesias' performance of *Quizás* on *The Tonight Show with Jay Leno* marked the first time a Spanish-language song was performed in the history of *The Tonight Show*.

32. For *Quizás*, Iglesias won a Latin Grammy for Best Pop Vocal Album.

33. Iglesias followed *Quizás* with the November 2003 release of *7* – appropriately titled as it was his seventh album, and third for Interscope.  Jimmy Iovine was the executive

producer of *7*. The singles, *Addicted* and *Not in Love*, charted with the latter song reaching the top of the dance charts.

34. In 2007, Iglesias released *Insomniac*, his fourth album on Interscope. The album featured *Push*, a collaboration with Lil' Wayne. The album's first single, *Do You Know?* was an international hit, charting in the United States as well as throughout Europe. The Spanish version of *Dímelo* stayed No. #1 on *Billboard* Hot Latin Songs chart for eleven weeks.

**F.     Success Prompts an Amendment of the 1999 Universal Agreement, but the Royalty Rate for Streaming is Left Undisturbed at Fifty Percent (50%)**.

35. In May of 2010, Universal, Interscope and Iglesias agreed to amend the 1999 Agreements[5] (the "2010 Amendment"). (A partially redacted copy of the 2010 Amendment is attached hereto as **Exhibit 4**). The 2010 Amendment acknowledged Iglesias' fulfillment of his contractual commitment to Interscope via the delivery of four English-language albums (*Enrique*, *Escape*, *7* and *Insomniac*) as well as one greatest hits album (titled "Greatest Hits"). (*Id.* at ¶ 2.1).

36. The 2010 Amendment obligated Iglesias to deliver to Universal two additional albums (as opposed to one last album) which, rather than being rendered only in Spanish-language, were to contain both Spanish and English language recordings. (*See id.* at ¶¶ 2.2, 4.2).

37. The 2010 Amendment altered the delivery schedule, changed the advances to be paid to Iglesias, and revised other deal terms. Notably, the 2010 Amendment provided that for all digital downloads after July 1, 2010, Iglesias was to receive the same royalty rate as the Album Royalty Rate.

38. The 2010 Amendment (like the 1999 Agreements) did not prescribe a royalty to

---

[5] The parties had previously modified specific terms of the 1999 Agreement (which are irrelevant to this dispute) through side letters.

the streaming of Iglesias' works.  This omission was not an oversight.  At the time the 2010 Agreement was executed, Pandora, SoundCloud and Spotify were amongst the many other entities already commercially exploiting this means of distribution.

39. Universal could have raised, negotiated, and "specifically covered" a streaming royalty rate in the 2010 Amendment.  It did not.

40. The 2010 Amendment deleted the jurisdiction and venue provision contained in the Universal Agreement, expressly eliminating the requirement that any dispute shall be subject to California law or litigated in California.

41. Paragraph 12 of the 2010 Amendment expressly provides that "[s]ave as varied and modified herein, the [Universal] Agreement shall remain in full force and effect," resulting in the provisions of Article I of the 1999 Agreements enduring without modification by the 2010 Amendment.  Article I has continually governed to the present day the payment of royalties by Universal for the streaming of Iglesias' musical works.

42.  After the 2010 Amendment, streams were still not "specifically covered" under Article I. Therefore, streams remained payable at a fifty percent (50%) royalty.

43. The crediting of a fifty percent (50%) royalty on streams is consistent with industry custom and standard.

**G.     Iglesias Performs His Amended Contractual Duties With Distinction**.

44. Shortly after the 2010 Amendment, Iglesias released *Euphoria*.  *Euphoria* was Iglesias' ninth studio album; the first released under Universal's label, Republic; and Iglesias' first bilingual album.  *Euphoria* contained seven original English songs, six original Spanish songs, and featured collaborations with Akon, Usher, Ludacris, Pitbull and a duet with Wisin & Yandel.

45. *Euphoria*'s first English single, *I Like It* (a song on which Interscope had famously passed) featured Pitbull, climbed to No. #4 of the *Billboard* Hot 100 chart and was reported by ASCAP as the most performed song for 2011. The lead Spanish single, *Cuando Me Enamoro*, was nominated for Song of the Year, became Iglesias' twenty-fifth top ten single, and his twenty-first No. #1 song on *Billboard* Hot Latin Chart. *Euphoria*'s third single, *Tonight (I'm F\*ckin' You*) became Iglesias' first No. #1 hit on the U.S. Pop Songs and Radio Song airplay charts and was the most performed song for 2012. A remix of *Dirty Dancer* was released as the fourth English single and became Iglesias' ninth Hot Dance Club Play chart topper, then tying him with Prince and Michael Jackson as the male performer with the most No. #1 dance singles.

46. *Euphoria* went platinum in the United States (twice over), won the *Billboard* Music Award for Top Latin Album and Latin Pop Album of the Year, and was nominated for a Latin Grammy for Album of the Year.

47. Iglesias' tenth studio album, *Sex and Love*, was released in March 2014. The album featured guest vocals from Jennifer Lopez, Pitbull, Romeo Santos, Marco Antonio Solis, Flo Rida, Kylie Minogue, Yandel, Gente de Zona and India Martinez. *Sex and Love* broke new cross-over pop culture ground by releasing four different versions of the album (with additional songs in both English and Spanish) on iTunes, internationally, and on store shelves.

48. *Sex and Love* contained a string of hits, including *I Like How It Feels*, *Turn the Night Up*, *Finally Found You*, *El Perdedor* and *Loco*. *El Perdedor* and *Loco* received critical acclaim.

49. *Sex and Love's* sixth single, *Bailando*, consisted of an original Spanish version featuring Cuban artists, Descemer Bueno and Gente de Zona, a Spanglish version featuring Jamaican singer Sean Paul, and two different Portuguese versions, one with additional vocals by

Brazil singer Luan Santana, and another including vocals from Portuguese singer Mickael Carreira. *Bailando* was amongst the top-selling songs of 2014 with more than eight million units (sales plus streams) worldwide. *Bailando* netted three Latin Grammys, 7 *Billboard* awards and sat atop *Billboard* Hot Latin Songs chart for a record-breaking 41 weeks.

50. At last count, the Spanish version of the *Bailando* music video had 2.459 billion views – making it the tenth most viewed video in YouTube™ history. *Bailando* became the first Spanish-language music video to have been viewed over a billion times. The English version of the *Bailando* music video has more than a quarter billion views.

51. *Sex and Love* was Spotify's seventh most-streamed album worldwide in 2014, and *Bailando* was the most-streamed song in both Mexico and Spain for that year.

52. After a successful, decade-long run with Universal, during which Iglesias sold more than 100 albums and generated billions of streams, Iglesias' relationship with Universal came to an end. In 2015, Iglesias signed with Sony Music.

**H.     Universal Breaches Its Obligations to Pay Iglesias a Fifty Percent (50%) Royalty on Streams and to Account Fully and Timely for such Royalties**.

53. Despite Iglesias' record-breaking success, Universal claims that Iglesias remains un-recouped. Universal's claim is unsupportable and unfathomable given Iglesias' indisputable commercial triumphs.

54. This gross discrepancy can be explained, in part, by Universal's improper crediting of streams at the incorrect Album Royalty Rate, which is less than a fraction of the Fifty Percent Streaming Royalty established by Paragraph 1.05 of Exhibit A to the 1999 Agreements. Because Iglesias ranks among the most-streamed artists, this improper accounting

has resulted in a shortfall of millions of dollars.[6]

55. In March of 2017, Iglesias sent a formal notice to Universal, noting his objection to Universal's accounting practices, taking exception to, among other things, its misapplication of the Album Royalty Rate to streams rather than the correct Fifty Percent Streaming Royalty, inaccurate sales reports, excess charges, unjustifiable deductions, and general accounting mistakes.

56. Universal did not respond to Iglesias' demand for an accounting. Universal refused to afford Iglesias access to its books and records as required by Paragraph 3 of Article A to the 1999 Agreements.

57. On August 21, 2017, Iglesias sent a demand letter to Universal, demanding that his accounts be properly adjusted.

58. Prior to the filing of this lawsuit, the parties entered into an agreement, tolling all filing deadlines as of the date of Iglesias' August 21, 2017 demand letter.

## COUNT I
**(Breach of Contract)**

59. Iglesias re-alleges and reincorporates paragraphs 1 through 58.

60. The Universal Agreement is a valid and enforceable contract between Universal and Iglesias.

61. The 2010 Amendment, which amended the Universal Agreement in part, is a valid and enforceable contract between Universal and Iglesias.

---

[6] Up until approximately 2016, Interscope properly recognized and credited Iglesias' streaming royalties at fifty percent (50%). However, upon receiving a directive from Universal, Interscope – without consulting or otherwise notifying Iglesias – began crediting streams at the incorrect, lower Record royalty rate. Years earlier, Universal made a similar decision to pay a reduced royalty for digital downloads, and that decision prompted a series of lawsuits and an $11.5 million dollar class action settlement. *Rick James v. UMG Recordings, Inc.*, Case 3:11-cv-01613 (N.D. Cal. 2011).

62. At all material times, Iglesias has satisfied all of his contractual obligations under the Universal Agreement, the 2010 Amendment, and all amendments thereto by, among other things, delivering first-class performances that Universal was able to manufacture, distribute, sell and license in various formats and media throughout the world.

63. Universal has committed multiple breaches of the Universal Agreement and the 2010 Amendment by, among other things, failing to properly account to Iglesias, incorrectly applying the Album Royalty Rate to streams as opposed to the Fifty Percent Streaming Royalty, inaccurately computing sales reports, and applying excessive charges, all in an attempt to obscure the true economics attendant to Iglesias' musical works.

64. Universal has submitted a series of inaccurate and incorrect account statements, each of which credited streams at the Album Royalty Rate and not at the Fifty Percent Streaming Royalty. Each inadequate account statement constitutes a separate, independent and continuing breach of the Universal Agreement and the 2010 Amendment.

65. Universal has further breached Paragraph 3 of the Universal Agreement by failing to afford Iglesias the access he demanded to Universal's books and records.

66. Paragraph 3.03 of Exhibit A to the Universal Agreement provides:

Universal will maintain books and records which report the sales or other exploitation of Phonograph Records and Master Recordings hereunder on which royalties are payable to [Iglesias]. [Iglesias] may, at your own expense, designate a certified public accountant ("CPA") to examine those books and records are provided in this paragraph only. Such examination: (a) may be made only for the purpose of verifying the accuracy of the statements sent to [Iglesias] under paragraph 3.01; (b) may be made for a particular statement only once and only within three (3) years after the date when Universal sends you that statement, and (c) may be made only during Universal's usual business hours, and at place where it keeps the books and records to be examined, and upon reasonable notice to Universal.

67. On March 13, 2017, Iglesias provided written notice to conduct an examination of Universal's books and records for all pertinent accounting statements ("Audit Demand").

68. On March 30, 2017, Universal acknowledged receipt of Iglesias' Audit Demand. Universal has not, however, substantively responded to the Audit Demand. Nor has Universal made any attempt to provide Iglesias with the contractually-mandated access to the salient books and records.

69. Universal's violation of Paragraphs 1 and 3 of Exhibit A to the Universal Agreement and the 2010 Amendment, and failure to account for and faithfully credit Iglesias for royalties owed for his musical works, constitute material breaches of the Agreements. Universal has financially benefitted from its wrongful acts and continues to collect income and misreport the royalties owed from Iglesias' musical works.

70. Universal has failed to and refuses to cure its breaches and continues to profit for its under-crediting and inappropriate treatment of income derived from Iglesias' musical works.

71. As a direct and proximate result of Universal's breaches of the parties' Agreements, Iglesias has incurred actual and substantial monetary damages and will continue to incur such damages in an amount to be determined at the final hearing in this matter.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Iglesias respectfully requests that the Court:

1. Enter judgment in his favor and against Universal;

2. Award actual and compensatory damages for Universal's wrongdoing in an amount to be established at trial, together with pre-judgment and post-judgment interest thereon at the maximum legal rate;

3. Enter a decree granting Iglesias access to Universal's books and records;

4. Order an accounting of all revenues in accordance with the terms of the parties' agreements; and

5. Such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Iglesias respectfully demands a trial by jury on all claims and issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  January 24, 2018
 Miami, Florida

>Respectfully submitted,
>
>**STROOCK & STROOCK & LAVAN LLP**
>Southeast Financial Center
>200 South Biscayne Boulevard, Suite 3100
>Miami, Florida 33131
>Telephone:  (305) 358-9900
>Facsimile:   (305) 416-2888
>jsammataro@stroock.com
>
>
>By:  *s/James G. Sammataro*
>    James G. Sammataro, Esq.
>    Florida Bar Number: 0520292