# EXHIBIT 1

JUN-23-1999  01:20

**Agreement** made as of the 20th day of May, 1999 between Universal International Records BV, Gerrit van der Venlaan, 3743 DM Baarn, the Netherlands (hereinafter "Universal" or "us") and Enrique Iglesias c/o Ziffren Brittenham Branca & Fischer, 1801 Century Park West, Los Angeles, California 90067, Attention: John Branca, Esq. (hereinafter referred to as "you" or "Artist"), for you to render your exclusive recording services (except as otherwise provided herein with respect to the "English Album Agreement" as further set forth hereinbelow) to us on the terms set forth herein. The royalty provisions to be applied herein and the definitions of the terms used herein are set forth in the Exhibit A attached hereto and incorporated herein by this reference.

Reference is hereby made to the agreement of even date herewith entered into between you and Interscope Records (the "English Album Agreement") with respect to your rendering your exclusive services in connection with delivering not less than two (2) nor more than four (4) Albums recorded in English (as otherwise provided therein) (hereinafter the "English Albums").

1.      Territory:      The Universe.

1A.      Term: The term of this Agreement shall commence upon the date hereof and shall end upon the date the later of (i) your Delivery of the second MRC Album (as defined herein) or if applicable the last "Overcall Album" as further set forth below and (ii) the Delivery of the last Album under the English Album Agreement. You warrant, represent, and agree that, commencing at the end of the Term of this Agreement and for a nine (9) month period following the later of (i) the release of the second MRC Album or if applicable the last "Overcall Album" and (ii) the release of the last Album under the English Album Agreement you shall not cause the manufacture or distribute through any Person other than Universal (or Interscope pursuant to the English Album Agreement) Phonograph Records consisting of Master Recordings embodying your Performances ("Post Term Exclusivity Period"). In any agreement entered into before or during such Post Term Exclusivity Period, between you, or any other Person furnishing your services, on the one side, and any Person other than Universal, on the other side, regarding the manufacture or distribution of Phonograph Records embodying Master Recordings of any Performance rendered by you, a recitation of the parties' compliance with the terms of this paragraph will be included for the benefit of Universal. The foregoing shall not be applicable to the Master Recordings heretofore recorded by you pursuant to your prior exclusive recording Agreement with Fonovisa Records.

2.      Recording Commitment:

(a)      Universal shall fund (as set forth in paragraph 3 below) and you commit to Deliver two (2) albums (individually and collectively referred to herein as "MRC Album(s)"). Each Album shall be recorded entirely in Spanish. You and Universal shall mutually determine if a third Album (the "first Overcall Album") or a fourth Album (the "second Overcall Album") shall be recorded by you hereunder, provided if your combined royalty account (i.e., both hereunder and under the English Album Agreement) is unrecouped in an amount in excess of ███████████████ (provided we shall take in to account "pipeline income", i.e., a good faith estimate of the

23-Jun-99 01:37A

royalties on net sales by our affiliates that have not yet been reported to us) as of the date fifteen (15) months after the initial release in the United States of the later of the second MRC Album hereunder and the second MRC Album under the English Album Agreement (as measured upon the last day of the calendar quarter-annual period during which such 15th month falls), then Universal shall have final approval over whether the first Overcall Album shall be recorded in Spanish and under this Agreement, it being understood that if it is not recorded in Spanish under this Agreement it shall be recorded in English under the English Album Agreement. In the event that you have recorded the first Overcall Album in English and Delivered it under the English Album Agreement, the second Overcall Album shall be recorded in Spanish under this Agreement (unless otherwise mutually determined by the parties). If you do not record the first Overcall Album in English and Deliver it under the English Album Agreement because you have instead recorded it in Spanish and Delivered it hereunder, then whether or not you are required to record the second Overcall Album in Spanish and Deliver it hereunder or record it in English and Deliver it under the English Album Agreement (one of which you shall be obligated to Deliver and we or Interscope shall be obligated to fund) shall be mutually determined by you and us. In addition to the MRC Albums and Overcall Albums (as applicable) you shall record three (3) newly recorded Sides to be included on the "Greatest Hits" Album (hereinafter the "GH Sides") as further provided herein. The parties hereto shall mutually determine whether such GH Sides shall be recorded in Spanish or recorded in English but in any event the GH Sides shall be Delivered under the English Album Agreement. For clarification purposes, as between this Agreement and the English Album Agreement you shall Deliver and Universal and Interscope shall fund an aggregate of six (6) MRC/Overcall Albums and one Greatest Hits Album.

(b)     Intentionally deleted.

(c)     No live albums, Christmas or other seasonal albums, spoken word albums, children's albums, instrumental albums or multiple albums unless approved by Universal in its sole unrestricted discretion. Each Album Delivered hereunder shall feature your first class performances, shall be satisfactory (as further provided in paragraph 6 below), and shall embody your featured vocal performances of selections which have not ever been previously recorded by you and released.

(d)     The delivery schedule for each Album shall be as follows: It is the intention of the parties that you will Deliver the first MRC Album in the Spring of 2000 (provided your failure to Deliver same in the Spring of 2000 shall not be deemed a breach hereof). You will Deliver each MRC and Overcall Album hereunder not earlier than twelve (12) months and not later than twenty-four (24) months after the date when you Delivered the most recent MRC or Overcall Album under the English Album Agreement nor later than thirty-six (36) months after the date when you Delivered the most recent prior MRC or Overcall (as applicable) Album hereunder. It is acknowledged that in between each MRC Album or Overcall Album Delivered hereunder you shall be Delivering an MRC Album or Overcall Album (as applicable) under the English Album Agreement (except as otherwise provided in the next sentence) and that you will Deliver the first English Album pursuant to the English Album Agreement prior to March 31, 2000. In the event that both the first and

23-Jun-99 01:37A

second Overcall Albums are recorded in Spanish and Delivered hereunder, you will Deliver the second Overcall Album not earlier than twelve (12) months and not later than twenty-four (24) months after the date when you Delivered first Overcall Album hereunder. In the event that any two (2) consecutive MRC/Overcall Albums are Delivered under this Agreement and not under the English Album Agreement as is contemplated as a possibility in subparagraph 2(a) above, then (i) the required Delivery Date for the second such MRC or Overcall (as applicable) Album shall be not earlier than twelve (12) months and not later than twenty-four (24) months after the date when you Delivered the first such MRC/Overcall Album, and (ii) the Album after such two consecutive Albums shall be Delivered no later than 60 months after the preceding same language Album. Your failure to timely Deliver shall not be deemed a breach hereof unless we have notified you in writing of such failure after such due date and you fail to cure within 3 months of the date of such notice.

3.    Advances/Recording Funds (Funds are inclusive of all recording costs and producer advances and are not recoupable from mechanical royalties):

(a)    MRC Albums and Overcall Albums (subject to subparagraph 3(c) below):



(1) The first MRC Album - ▮▮▮▮▮▮▮▮▮▮ subject to subparagraph 3(c) below. In accordance with subparagraph 3(g) below ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ from each Recording Fund shall be pre-paid leaving a balance for the first MRC Album, after the pre-payment, of ▮▮▮▮▮▮ subject to subparagraph 3(c) and paragraph 18 below;

(2) The second MRC Album: ▮▮▮▮▮▮▮▮ subject to subparagraphs 3(c) below. In accordance with subparagraph 3(g) below ▮▮▮▮▮▮▮▮▮ from each Recording Fund shall be pre-paid leaving a balance for the second MRC Album, after the pre-payment, of ▮▮▮▮▮ subject to subparagraph 3(c) and paragraph 18 below;

(3) The first Overcall Album (or the second Overcall Album if the first Overcall Album is recorded in English and Delivered under the English Album Agreement, but in no event both Overcall Albums): ▮▮▮▮▮▮▮▮ subject to subparagraphs 3(c) below. ▮▮▮▮▮▮▮ from each Recording Fund shall be pre-paid leaving a balance of the Recording Fund for the applicable Overcall Album, after the pre-payment, of ▮▮▮▮▮ subject to subparagraph 3(c) and paragraph 18 below;

(4) The second Overcall Album if both Overcall Albums are recorded in Spanish and Delivered hereunder: ▮▮▮▮▮▮▮▮▮▮▮ subject to subparagraph 3(c) and paragraph 18 below.

(b)     Intentionally deleted.

(c)     In connection with each MRC Album or Overcall Album hereunder (i.e., recorded in Spanish), in the event that the immediately preceding MRC or Overcall Album hereunder (i.e., recorded in Spanish) (if any) has achieved sales in excess of ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ units in the Featured Countries through normal retail channels within twelve (12) months of its initial release in the United States (as measured upon the last day of the month during which such 12th month falls including a good faith estimate based on internal information of the number of units sold in such time period) (the "12 month period"), the otherwise applicable Recording Fund for such then current MRC or Overcall Album hereunder (i.e., recorded in Spanish) shall be increased by the amount of $1.00 multiplied by the good faith estimate of the number of units of the immediately preceding MRC or Overcall Album sold in the Featured Countries through normal retail channels within such twelve (12) month period in excess of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ units up to a maximum of ▮▮▮▮▮▮▮▮▮▮.

(d)     The amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ of each MRC and Overcall Albums' Recording Fund shall be non-recoupable.

(e)     Intentionally deleted.

(f)     Each Album hereunder shall be recorded on a mutually pre-approved budget basis. In determining whether a budget shall be approved the parties shall consider the budgets of Interscope's superstar pop vocalists of Artist's stature and the applicable language such album shall be recorded in. Universal shall "P.O." the respective Recording Costs in accordance with such pre-approved budget (i.e. issue purchase orders to the respective studios in accordance with the pre-approved budget and thereafter issue payment in accordance therewith). Regardless of your recoupment status Universal will accept letters of direction for payment in accordance with our then current standard form. All Recording Costs will constitute Advances. Any Recording Costs in excess of the applicable Recording Fund or other amount approved by Universal, and all Special Packaging Costs, will be your sole responsibility and will be paid by you promptly (or reimbursed by you if paid by us). Those amounts will also be recoupable from all monies, other than those Advances set forth in subparagraphs 3(a), (c), and (g) hereof (and 3(a), (b), (c), (g) and (j) of the English Album Agreement) (hereinafter the "Contractual Advances"), becoming payable by us to you under this Agreement and the English Album Agreement (except any Recording Costs in excess of the applicable Recording Fund or other amount approved by Universal shall not be recoupable from mechanical royalties payable hereunder or under the English Album Agreement). Each Album shall be recorded in accordance with the requirements of all applicable unions, if any. The balance (if any) of each applicable Recording Fund shall be payable promptly following Delivery of the Album concerned (and paid pursuant to paragraph 18 hereinbelow).

(g)     Subject to paragraph 18 below, we shall make an Advance payment to you in the amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which

amount shall be deemed a pre-payment of ████████████████████████████ from the Recording Funds for each of the first MRC Album, second MRC Album and the first Overcall Album (or the second Overcall Album if the first Overcall Album is recorded in English and Delivered under the English Album Agreement as otherwise provided herein). Such amount shall be payable as follows:



       (i) ████████████████████████████ ████████ promptly following the execution hereof; and

       (ii) ████████████████████████ ████████ on July 1, 1999.

    (h)    Intentionally deleted.

   3A.   (a)   Universal guarantees to pay Artist annual compensation ("Annual Payments") during each of the first seven (7) "Fiscal Years" (as hereinafter defined) which when combined with the amounts paid by Interscope under the English Album Agreement equal such amounts as are set forth in sections (1), (2) and (3) below. Artist hereby agrees to accept all such Annual Payments. As used in this paragraph, "Fiscal Year" shall mean each consecutive twelve (12) month period during which both this Agreement and the English Album Agreement are in effect, commencing with the date of commencement of the term of this Agreement. At least thirty (30) days before the end of each Fiscal Year, Artist shall notify Universal in writing if it has not received compensation equal to the Annual Payment for such Fiscal Year and the amount of the deficiency (provided Artist's failure to so notify shall not be deemed a breach hereof), and Universal will pay Artist the amount of the deficiency.



       (1)  ████████████████████████ for the first Fiscal Year of the Agreement;

       (2)  ████████████████████████ for the second Fiscal Year of the Agreement; and

       (3)  ████████████████████ for each of the third through seventh Fiscal Years of the Agreement.

    (b)    If in any Fiscal Year the aggregate amount of the compensation (other than Mechanical Royalties) paid to Artist under this Agreement and the English Album Agreement exceeds the Annual Payments due to Artist, such excess compensation shall apply to reduce the Annual Payments due to Artist for any subsequent Fiscal Years. Artist acknowledges and agrees that the Advance payable to Artist pursuant to subparagraph 3(g) of this Agreement and the English Album Agreement collectively shall satisfy Universal's obligation to pay Artist Annual Payments in respect of the first 7 Fiscal Years.

    (c)    Each Annual Payment shall be due on or before the last business day of the Fiscal Year to which it applies; provided that if the Agreement expires or terminates prior

JUN-23-1999  01:22                                                                    P.23/33

to the end of a particular Fiscal Year, the applicable Annual Payment shall be reduced proportionately, or shall be such greater amount, if any, as is required pursuant to California Civil Code Section 3423. Any failure by Universal to make an Annual Payment will not constitute a material breach of the Agreement.

        (d)     Universal shall have the right to pay Artist at any time any additional amounts which may be required to be paid as a condition to Interscope's petitioning for an injunction pursuant to Section 526 of the California Code of Civil Procedure and Section 3423 (5th) of the California Civil Code ("Additional Payments"). Artist hereby agrees to accept any and all such Additional Payments. All compensation (other than Mechanical Royalties) paid to Artist hereunder (and under the English Album Agreement) which is not applied to the Annual Payments theretofore due will be credited toward satisfying the obligation to make Additional Payments as a prerequisite to seeking injunctive relief hereunder. If Universal actually makes any Additional Payments and thereafter elects not to seek such injunction, such Additional Payments shall constitute Advances hereunder.

        (e)     Each Annual Payment and Additional Payment, if any, will constitute an Advance and will be applied in reduction of any and all monies (other than Mechanical Royalties) due or becoming due Artist under this Agreement or the English Album Agreement. Notwithstanding anything to the contrary contained herein, whenever in the Agreement Universal has the right to deduct excess expenditures (including, without limitation, excess Recording Costs, Mechanical Royalties and Special Packaging Costs) from any and all monies otherwise due or becoming due Artist under this Agreement or the English Album Agreement, Universal's such right shall not extend to deducting such excess from Mechanical Royalties.

    4.    Royalties (inclusive of all third parties, including producers) computed at the applicable percentage, indicated below, of the applicable Royalty Base Price) and payable in accordance with the royalty provisions set forth on Exhibit A:

        (a)     Full-priced Albums (payable in respect of ███████████████ of Net Sales) in the United States, Mexico, Spain, Argentina, Chile, Brazil, Canada: ████

        (b)     Full priced Albums (payable in respect of ████████████ of Net Sales) in France, Germany, the United Kingdom, Portugal, Venezuela, Columbia, Italy, Holland, Australia and Japan: ███

        (c)     Full-priced Albums (payable in respect of ███████████ of Net Sales) in the rest of the world: ███

    5.    Mechanical Royalties: All Controlled Compositions (i.e., songs written or controlled, directly or indirectly, in whole or in part, by Artist, any affiliated company of Artist, any producer or any affiliated company of any producer) are hereby licensed to Universal's affiliates, its distributors and its licensees for the U.S. and Canada, respectively, at a rate equal to ██████████ statutory rate (i. e., without regard to the so-called "long-

23-Jun-99 01:37A

song formula") which is in effect in the applicable country for the applicable Controlled Composition on the date of release of such Master Recording (but no later than one year after the date such Master Recording was due to be Delivered hereunder) provided the foregoing parenthetical shall not be applicable if the sole cause of the delay in the timely Delivery or release of the applicable Master Recording is due to Universal's acts or omissions or if Universal and you mutually agree to delay the release of the applicable Album on which such Master Recording are embodied. The date for determining the applicable mechanical royalty rate for each Master Recording embodied on the Greatest Hits Album (as same shall be released under the English Album Agreement) shall be the date of initial release of the Greatest Hits Album in the United States and Canada respectively (i.e., not the date of release of each Master Recording as initially released on a respective MRC Album) and the foregoing "one-year" proviso shall be inapplicable to Greatest Hits Albums. A maximum of 2 times, 4 times, 6 times and 11 (except 12 for compact discs and "Digital Download Records" [as defined in subsection 5.09(a)(iii) of the Exhibit A attached hereto]) times the Controlled Rate for all songs on each 7" single, 12" single, extended play record and album, respectively. If a Composition is Controlled because it is written or controlled by a producer and not by you and the "long song formula" is applicable, Universal shall increase the cap commensurately so that portion of the excess mechanicals payable to the producer in connection therewith does not otherwise reduce mechanical royalties payable to you hereunder. Mechanical royalties payable on each record sold through record clubs shall be ▆▆▆ of the above rate. Mechanical Royalties shall be payable on ▆▆▆ of "standard" free goods. Mechanical royalties payable on records distributed through military exchange channels shall be the otherwise applicable mechanical rate. Mechanical royalties on Mid-price records shall be ▆▆▆ of the above rate (▆▆▆▆▆▆▆▆▆▆ in the case of compact discs). Mechanical royalties payable on each budget record and each record sold as a premium shall be ▆▆▆ of the above rate. (The preceding reduction to the mechanical rate will not apply to a Budget Record sold within twenty-four (24) months or to a Mid-price Record sold within eighteen (18) months after the initial release of the Master Recordings concerned on Phonograph Records.)

6.      Individual Producers/Creative Control: The individual producer, selections, recording budget and time and place of recording shall be mutually determined by Interscope and you. You shall have approval over the material terms if Universal contracts with a third party producer. All recordings hereunder shall be satisfactory in Universal's sole reasonable judgment, provided satisfactory shall be defined as  (a) it is technically satisfactory to Universal for Universal's manufacture and sale of phonograph records; (b) the performance recorded in it is "first class" (as that term is understood in the record industry); and (c) that performance is at least of the quality of Artist's prior recorded performances. You shall have the right, and we anticipate that you will record each Album hereunder outside of the United States and specifically, the recording of the second MRC Album or the first Overall Album (or second Overall Album if Delivered under this Agreement) and your touring in promotion of such Album may be done out of the United States for a period not to exceed one (1) year.

7.      Videos: Universal shall commit to produce at least two (2) Covered Videos in connection with each MRC or Overall Album released hereunder provided videos are, at such

time, a primary marketing tool in the United States recording industry or Interscope is then producing videos in conjunction with its marketing plans for the majority of Interscope's superstar artists of similar stature. With respect to each such Covered Video that Universal agrees to produce, ████████████ of all video production costs (or payments to acquire video rights) paid by Universal will be recoupable from record royalties and ████ ████████ thereof will be recoupable from video royalties. You and Universal shall mutually agree on the production budget for each such video. You and Universal shall mutually approve the story board, location, director and all other creative elements of each video. The quality of each video produced hereunder shall be commensurate with the quality of videos produced for Interscope's superstar artists. You and Universal shall mutually approve the selection to be embodied in each video provided any selection embodied as the A-side of any single shall be deemed pre-approved hereunder.

8.     Ownership: All Master Recordings recorded or delivered hereunder during the Term hereof, from inception of recording, and all reproductions derived therefrom, and all videos embodying those recordings and all artwork created for use in connection with those recordings shall be Universal's property, owned by Universal from inception and Universal shall be the copyright proprietor thereof, for the Territory in perpetuity. Artist's services hereunder and the proceeds thereof shall be, from inception "works for hire" for purposes of the United States Copyright Act and all other copyright laws through out the Universe. If Universal shall be deemed not to be the "author" of any of the Master Recordings hereunder, this Agreement shall constitute an irrevocable transfer of ownership of copyright therein. Subject to the terms and conditions of this Agreement, Universal and its distributors/licensees shall have the right to exploit all such masters in any and all forms of media now known and hereinafter developed and shall have the further exclusive right to use Artist's name, likeness and biographical material (such likeness and biographical material subject to your reasonable and timely approvals) in connection with any and all promotion, marketing and/or exploitation of such masters. No commercial merchandising rights are granted to Universal herein.

9.     Release Commitment:

(a)     United States within 120 days after Delivery. In the event that we fail to release an Album hereunder in the United States during the applicable 120 day period, we shall have the right to cure within 60 days from our receipt of your notice notifying us of our failure to release. You must notify us within nine (9) months of the end of such 120 day period or you waive such right;

(b)     Canada, Mexico, UK, Italy, France, Germany, Benelux, Spain, Portugal, and each country in Central America and South America where Universal's distributor has a wholly-owned company within 120 days of initial US release provided solely in the Spanish speaking territories within 120 days after Delivery. In the event that we fail to release an Album hereunder in any of the above-mentioned territories during the applicable 120 day period, you shall have the right to notify us within nine (9) months of such 120 day period to cure within 90 days after such notification and if we fail to cure within such 90-day period, our rights to exploit the unreleased albums and all future albums hereunder in such unreleased

territory(ies) shall terminate at the end of such cure period.  For purposes herein, Universal's distributor's wholly owned companies in Central America and South America consist of: Argentina, Brazil, Chile, Columbia, Venezuela, Bolivia, Ecuador, Peru, Uruguay and Costa Rica (which company also covers the countries of Guatemala, El Salvador, Nicaragua, Honduras and Panama).  The foregoing is subject to change as a company may be bought or sold at any time (i.e., a company in Paraguay is planned to be established in late 1999).

10.    Album Artwork:  Artist shall have the right to create all album artwork.  The budget for the album artwork shall be mutually approved by Universal and Artist and such amount shall be commensurate with the applicable budgets for Interscope's superstar artists.  Artwork costs incurred within the approved budget shall be non-recoupable.  If you do not create the artwork you shall have the right to approve all artwork (subject to actual time constraints), and name and likeness uses.  On your written request Universal shall license the album artwork to you for your use on commercial merchandise on a gratis and quit claim basis subject to all 3rd parties rights and restrictions (if any).

11.    Marketing:    Universal shall meaningfully consult with you in a good faith, meaningful manner on creating and developing a marketing, advertising and promotion plan for each Album delivered hereunder which plan shall be commensurate with Interscope's superstar artists (this sentence shall not be interpreted to require Universal to increase the video commitment or alter the release commitment made in this Agreement).   In connection therewith, Universal will obtain your approval of the general concept and theme of each national or other major advertising, marketing and promotion campaign in the United States and the major territories (including the major Spanish speaking territories) relating to such Albums (which consent may not be unreasonably withheld) provided that you shall not have the right to frustrate Universal's ability to release any Album in a timely fashion.  Subject to your reasonable availability and Universal's actual time constraints, you shall have the right to approve the visual elements, concepts, ideas, wording and design of posters, advertisements and other marketing materials which are under Interscopes control in the United States and major territories (including the major Spanish speaking territories), but once you have done so Universal will not be obligated to obtain your approval of any specific advertisements or other related materials or of any specific placement of advertisements, but such advertisements, related materials, and placements will be consistent with the approved general concept and theme, and will incorporate the pre-approved design. Subject to your arranging same, you may have a representative present at major marketing/promotion meetings in the U.S. and the major territories (including the major Spanish speaking territories) held to discuss the marketing/ promotion of Albums recorded hereunder.  Universal agrees to hire an independent public relations person (on a non-recoupable basis) in conjunction with the release of each album hereunder in the United States which hire and budget shall be mutually approved.  Further, Interscope shall arrange for your designated representative to receive BDS and Soundscan information on-line (we shall pay on a non-recoupable basis for the costs of such service, but not your costs of accessing same, i.e., we shall not pay for your costs of going on line or purchasing a computer).  All costs incurred in connection with "Independent Promotion" of records hereunder shall be ▮▮▮ recoupable from all royalties (excluding mechanical royalties) hereunder provided in no event shall any amounts in connection with

23-Jun-99 01:37A

independent promotion in excess of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ per Single ▮▮▮▮▮▮▮▮ be recouped without your consent. In addition, in connection with each Album released hereunder, subject to your prior professional commitments in connection with promoting the then current Album hereunder, you agree to undertake mutually agreed promotion activities (e.g., appear at radio stations and in-store events) at least 4 (not necessarily consecutive) weeks in Europe (excluding Holland) and 2 (not necessarily consecutive) weeks in the Far East, which promotion activities shall be at Universal's sole costs on a non-recoupable basis to you unless same is in conjunction with a concert tour in which case only the incremental costs shall be paid by Universal and shall be on a non-recoupable basis.

11A.   Marketing Restrictions: Universal shall not, except as otherwise provided herein:

(a)   Initially release any Album under any record label other than a top-line label then used by Universal in the country concerned for release of performances by Universal's best selling artists in Artist's genre then under exclusive term contract to Universal.

(b)   Other than as allowed in subparagraph 11A(d) below, License or otherwise authorize the use of Master Recordings recorded hereunder for use in commercials or for synchronization with feature film, television shows or commercials (other than commercials advertising phonograph records hereunder) or for any other Phonograph Record or non-Phonograph Record use.

(c)   Use, license or otherwise authorize the use of Master Recordings made under this Agreement on "Premium Records".

(d)   Couple (or license for coupling) for commercial exploitation Master Recordings made or furnished hereunder with recordings not embodying Artist's performances, except in each country Universal shall not need your consent to couple or license for coupling one (1) Master Recording per every one (1) year in connection with one (1) "Now," "Bravo" or similar compilation.

(e)   Sell Albums solely derived from Master Recordings made hereunder in the US as "cut outs" within thirty (30) months after the initial release of the Album concerned.

(f)   Exploit outtakes.

(g)   Select an "A-side" or b- side of a Single in the major territories (including Mexico, Central America and South America) without your prior approval.

(h)   Initially release any Album at a "price point" below "top-line" in the applicable market for that applicable language record.

(i)      License any Album hereunder to a record club.

(j)      Incur any Enhanced Costs hereunder.

(k)      Commercially exploit a Covered Video hereunder.

(l)      Authorize the use of a Record hereunder on a catalog Phonograph Record sold by our special products operations or our Licensees ("SPO's") for sale to educational institutions or libraries, or to other SPO clients for their promotion or sales incentive purposes or on a non-catalog Phonograph Record created on a custom basis for SPO clients.

12.    (a)    You represent, warrant and agree that you have the right to enter into this Agreement and that, subject to paragraph 13 hereinbelow, no Person other than Universal (or Interscope pursuant to the English Album Agreement) will be authorized to use any existing Master Recordings of your Performances for making, promoting, or marketing Phonograph Records and that there are no authorized unreleased recordings by you which may be exploited by third parties during the Term hereof (other than those recordings you recorded for Fonovisa Records during the term of your prior exclusive artist agreement with them). You represent, warrant and agree that the Master Recordings and all other all other materials, including without limitation, all Controlled Compositions; each name or sobriquet used by you, and all other musical, dramatic, artistic and literary materials, ideas and other intellectual properties furnished or selected by you, or any individual producer and contained in or used in connection with any recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof, shall not infringe upon the rights of any third parties. You warrant and represent that during the Term of this Agreement you will not enter into any agreement which would interfere with the full and prompt performance of your material obligations hereunder and that during the Term hereof, you will not perform or render any services as a recording artist for making Phonograph Records or allow your Performances to appear on Phonograph Records for any Person except Universal (and Interscope pursuant to the English Album Agreement). For the avoidance of doubt, nothing contained herein shall be deemed to restrict Artist from rendering an on camera performance for film , television, pay-per-view, or other audio-visual distribution provided no audio only Phonograph Record or home video device is derived from such performance. Furthermore, nothing in this Agreement shall be deemed to restrict or prevent Artist from establishing and maintaining his own Internet website or rendering performances on a third party Internet website provided that Artist's performances on his or a third party's website shall be limited to (i) not more than one live show cybercast (which shall be "streamed" and not "downloadable") per year (in the aggregate under this Agreement and the English Album Agreement), which show may be re-run one time on a scheduled date (i.e., not on demand); and (ii) not more than once per year up to three (3) "live" performances (which performances may not be live versions of compositions which are or may reasonably be designated as future singles derived from Albums hereunder until Universal is no longer actively promoting such single) (in the aggregate under this Agreement and the English Album Agreement) may be available on the applicable website for up to thirty (30) days on demand (which shall be "streamed" and not

JUN-23-1999  01:25

"downloadable"). Each such broadcast shall be of "limited quality" (i.e., less than CD quality). Artist may not use Master Recordings made under this Agreement on such applicable website with out Universal's prior consent.

(b)     (1)     A "restricted Composition", for the purposes of this subparagraph, is a Composition which shall have been recorded by the Artist for a Master Recording made or Delivered to Universal under this Agreement.

(2)     Artist will not authorize or knowingly permit his Performance, nor shall Artist render any Performance, of any restricted Composition or any adaptation of a restricted Composition to be recorded for any Person except Universal for the purpose of making Phonograph Records, at any time before the later of the following dates: (i) the date five (5) years after the date of initial Delivery to Universal of all the Master Recordings made in the course of the same Album (or other) recording project as the Recording of the restricted Composition concerned, or (ii) the date two (2) years after the expiration or termination of the Term of this Agreement or any subsequent agreement between Universal and you (or any Person furnishing the your recording services or the results and proceeds thereof) with respect to you recording services.

(c)     Universal shall be entitled to seek injunctive and other equitable relief, in addition to whatever legal remedies are available, to prevent or cure any breach or threatened breach of this Agreement. You will at all times indemnify and hold harmless Universal and any of its Licensees (collectively the "Indemnitee") from and against any and all third party claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach or alleged breach of any warranty or representation made by you in this Agreement or any other act or omission by you, provided the claim concerned has been settled (subject to the provisions of subparagraph 12(d) below) or has resulted in a judgment against any Indemnitee. (For purposes of clarification, the foregoing indemnity is not applicable to any claims brought against Universal (or its affiliates and Licensees) by Fonovisa Records (or its affiliates and licensees) in connection with the Master Recording entitled "Bailamos" as further set forth in paragraph 13 below). Universal will notify you of any action commenced on such a claim. You may participate in the defense of any such claim through counsel of your selection at your own expense, but Universal will have the right at all times, in its sole discretion, to retain or resume control of the conduct of the defense. If any claim involving such subject matter has not been resolved, or has been resolved by a judgment or other disposition which is not adverse to any Indemnitee, you will not have any reimbursement obligation to Universal for any of the expenses actually incurred by Indemnitee in connection with that claim. Pending the resolution of any such claim, Universal will have the right to withhold monies which would otherwise be payable to you under this Agreement in an amount not exceeding your potential liability to Universal under this paragraph; provided, however, Universal will not withhold monies from the Contractual Advances. In addition, Universal will not withhold other monies which otherwise would be payable to you under this Agreement, if you make satisfactory bonding arrangements in accordance with subparagraph 12(d) below. If no action or other proceeding for recovery on such a claim has been commenced within one (1) year after its assertion, Universal will not

23-Jun-99  01:37A

continue to withhold monies in connection with it under this paragraph unless Universal reasonably believes that a suit may still be commenced.

(d)   If Universal pays more than ▮▮▮▮ in settlement of any such claim, you will not be obligated to reimburse Universal for the excess unless you have consented to the settlement, except as provided in the next sentence.  If you do not consent to any settlement proposed by Universal for an amount exceeding ▮▮▮▮ you will nevertheless be required to reimburse Universal for the full amount paid unless you make bonding arrangements, satisfactory to Universal in its reasonable discretion, to assure Universal of reimbursement for all damages, liabilities, costs and expenses (including legal expenses and reasonable counsel fees) which Indemnitee may incur as a result of that claim.  If no action or other proceeding for recovery on such a claim has been commenced within one (1) year after its assertion, Universal will not continue to withhold monies in connection with it under this paragraph.

13.   "Bailamos":  As between you and Universal and Interscope the recording of the Composition entitled "Bailamos" embodying Artist's Performance shall be deemed a Master Recording recorded under the English Album Agreement for all purposes.

14.   Remixes: Universal shall not deduct from any Recording Fund any costs incurred in connection with the remixing of any master to the extent such remix is for radio/promotional use, ~~nor shall~~ such costs be recoupable.  Further, Universal shall not remix or cause any third party to remix any Master Recording hereunder without your consent.  In addition, Universal shall not edit, repackage or otherwise alter in any fashion, remaster or resequence (nor instruct nor cause any third party to edit, repackage or otherwise alter in any fashion, remaster or resequence) any Master Recording recorded hereunder.  The preceding sentence will not apply to resequencing for the purpose of equalizing the running time of tracks on phonograph records in non-disc physical configurations.

15.   Universal shall not exploit any Master Recordings that are not Delivered as part of a completed Album or designated as a Single hereunder and such Master Recording(s) shall only be exploited as part of such Album or Single as Delivered or designated respectively.

16.   Wherever consents and approvals required hereunder, same shall be deemed given within ten (10) business days of our written request therefor.

17.   No music publishing ownership or administration rights are granted to Universal hereunder.

18.   Universal acknowledges that for tax purposes all monies payable to you hereunder are for services rendered by you as a recording artist as opposed to royalty income.

(a)   Notwithstanding anything to the contrary contained in paragraph 3 above or otherwise, all of the Advances payable hereunder other than Recording Costs shall be paid to a "Trust" (as defined below) at the time such Advances are otherwise payable pursuant to paragraph 3, or if not so paid to the Trust (as further provided herein), such Advances shall

23-Jun-99 01:37A

be "Deferred" (as defined below). The parties acknowledge that they have not as of the execution hereof determined an appropriate Trust that satisfies the intentions of each party. The parties agree to work together to determine such a Trust. If Advances hereunder are paid into a Trust, Artist acknowledges that for the purpose of royalty accounting only, Universal's records will reflect that such payments have been charged against Artist's royalty account. In the event that the parties are unable to agree on an appropriate Trust (and neither party shall be required to agree to anything that it determines to be adverse to its interests and both therefore acknowledge that it may be impossible to agree), then all of the Advances payable hereunder other than Recording Costs shall be "Deferred" (as defined below). If Advances hereunder are Deferred, Artist acknowledges that for the purpose of royalty accounting only, Universal's records will reflect that such payments have been charged against Artist's royalty account as of the date such Advances would have been paid if not Deferred, rather than the date subsequently paid.

      (b)    As used herein "Trust" means a trust established by Universal under which monies are segregated from the general assets of the grantor (which, for purposes hereof shall be deemed to be Universal) and held exclusively for the benefit of Artist, subject only to the rights of creditors of Universal. The trustee of the Trust shall, after consultation with the Artist, control the investment of the funds deposited therein and the Artist shall obtain the benefit or detriment of the resultant gains or losses. The trustee of the Trust shall distribute the assets held in the Trust to Artist at such time as Universal would otherwise have been required to pay Artist had such Advances been Deferred. As used herein "Deferred" means that Universal shall pay all of the Advances to Artist, other than Recording Costs, on the later of (i) December 31, 2010, or (ii) promptly following the Delivery of the last MRC Album or Overcall Album or Greatest Hits Album under both this Agreement and the English Album Agreement. If monies are Deferred, Universal shall accrue and pay Artist interest thirty days after the Deferred monies are paid to Artist, such interest shall be calculated at the six-month LIBOR rate, compounded, for the period between the date such monies would have been paid (to a Trust or otherwise) had they not been Deferred, and the date of the actual payment. At such time as the Trust assets are distributed to Artist or the Deferred monies are paid to Artist such assets or monies will not be considered Advances since they will have previously been charged against Artist's royalty account.

      (c)    The parties acknowledge that royalties payable under both this Agreement and the English Album Agreement may be applied to recoup Advances under this Agreement and the English Album Agreement. For the purposes of this paragraph, the account containing the aggregate of Advances under both this Agreement and the English Album Agreement and the aggregate of royalties under both this Agreement and the English Album Agreement shall be referred to as your "Combined Royalty Account". If such Combined Royalty Account becomes payable sooner than it would have had Advances been //

//

paid according to the "Baseline Schedule" (as defined below), neither Universal under this Agreement nor Interscope under the English Album Agreement shall be obligated to pay you royalties until they would have been obligated to pay had Advances been paid according to the Baseline Schedule.  For purposes of the preceding sentence in determining whether royalties would have been payable had Advances been paid according to the Baseline Schedule, only actual Advances from inception through the date of the determination shall be counted. (As a clarification only, Universal will compare the actual Advances paid to the Advances that would have been paid under the Baseline Schedule in making its determination; i.e., it may not combine actual Advances with Baseline Schedule advances in making its determination).  If at the end of an accounting period royalties would be payable but are held in accordance with the third preceding sentence, such monies shall be credited to your royalty account to offset your Combined Royalty Account debit balance.  There shall be no double recoupment of Advances.  The following schedule for the payment of Advances is defined as the "Baseline Schedule": ███████████ payable upon execution of this Agreement and ½ payable on July 1, 1999 and the Recording Funds in the following amounts (payable ████████ on commencement of recording and the balance less Recording Costs paid by Interscope/Universal payable on Delivery): ███████ for the first Album Delivered under this Agreement or under the English Album Agreement, and ████████ for each of the five subsequent Albums Delivered under this Agreement or the English Album Agreement. (By way of clarification only, the Recording Fund amounts set forth in the preceding sentence were determined by subtracting from ███████ (A) ██████████ paid as set forth above, (B) ████████ in non-recoupable money paid ½ on execution of this Agreement and ½ on July 1, 1999, (C) █ non-recoupable money paid in connection with each MRC and Overcall Album, (D) ████████ minimum paid in connection with a Greatest Hits Album, and (E) █████████ extra payable on Delivery of the first Album, and then dividing the result by six and adding ████████ to the first Album Recording Fund).  For the purposes of the Baseline Schedule the foregoing Advances shall be increased as contemplated by subparagraph 3(c) of this Agreement and subparagraphs 3(b) and 3(c) of the English Album Agreement.  The Baseline Schedule shall also include an Advance for the Greatest Hits Album as described in the English Album Agreement, paid as described therein.

19.    THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF CALIFORNIA.  THE CALIFORNIA COURTS (STATE AND FEDERAL), ONLY, WILL HAVE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH INVOLVES SUCH A CONTROVERSY WILL BE BROUGHT IN THOSE COURTS, IN LOS ANGELES COUNTY, AND NOT ELSEWHERE.  ANY PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY, AMONG OTHER METHODS, BE SERVED UPON YOU BY DELIVERING IT OR MAILING IT, BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS DESIGNATED ON THE FIRST PAGE HEREOF OR SUCH OTHER ADDRESS AS YOU MAY DESIGNATE IN WRITING. ANY SUCH PROCESS MAY, AMONG OTHER METHODS,

23-Jun-99  01:37A

BE SERVED UPON THE ARTIST OR ANY OTHER PERSON WHO APPROVES, RATIFIES, OR ASSENTS TO THIS AGREEMENT TO INDUCE UNIVERSAL TO ENTER INTO IT, BY DELIVERING THE PROCESS OR MAILING IT BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS DESIGNATED ON THE FIRST PAGE HEREOF OR SUCH OTHER ADDRESS AS THE ARTIST OR THE OTHER PERSON CONCERNED MAY DESIGNATE IN WRITING.  ANY SUCH DELIVERY OR MAIL SERVICE SHALL BE DEEMED TO HAVE THE SAME FORCE AND EFFECT AS PERSONAL SERVICE WITHIN THE STATE OF CALIFORNIA.

20.    This Agreement shall be the sole and exclusive binding agreement between the parties setting forth the entire understanding of the parties hereto relating to the subject matter hereof and superseding all prior or contemporaneous agreements, negotiations, promises, representations, understandings and/or discussions whether oral or written, pertaining thereto. No waiver of any of the terms or provisions hereof shall be binding upon either party hereto unless confirmed by a written instrument signed by such waiving party.  No modification or amendment of this Agreement or of any of the terms or provisions hereof shall be binding upon either party hereto unless confirmed by a written instrument signed by both parties hereto.  No waiver by either party hereto of any term or provision of this Agreement or of any default hereunder shall affect Universal's or your respective rights thereafter to enforce such term or provision or to exercise any right or remedy in the event of any other default whether or not similar.

**ACCEPTED AND AGREED:**

Universal International Records BV

By: _____

By: _____
     Enrique Iglesias

EXHIBIT A

**ROYALTIES**

      1.01.   Universal will pay you a royalty computed at the applicable percentage, indicated in subparagraphs 4(a), (b) and (c) of the Agreement to which this Exhibit A is attached (and in subparagraph 1.01(a) below as applicable), of the applicable Royalty Base Price in respect of Net Sales Through Normal Retail Channels of Phonograph Records consisting entirely of Master Recordings recorded under this Agreement during the term and sold by Universal or its Licensees ("NRC Net Sales").  (Such royalty shall include your royalties and all royalties payable to all other artists, producers, and other Persons (provided such artists, Persons and producers are engaged or approved by you) which become or may become due by reason of the recording and/or exploitation of Master Recordings recorded under this Agreement, other than "per-record royalties" which shall be paid by Universal)  The royalties payable pursuant to the provisions of paragraphs 1.01, 1.02, 1.03, 1.04, and 1.05 and the provisions of Article 2 below shall apply to all Phonograph Records except Audiovisual Records.  The royalties payable pursuant to the provisions of paragraph 1.06 shall apply solely to Audiovisual Records.

      (a) ON SINGLES,  TWELVE-INCH SINGLES AND EXTENDED PLAY RECORDS: ▮▮▮▮

    1.02.   (a)      The royalty rate on any Record described in section (1) or (3) of this sentence will be one-half (1/2) of the royalty rate that would apply if the Record concerned were sold Through Normal Retail Channels; the royalty rate on any Record described in section (2) of this sentence will be 2/3 of the royalty rate that would apply if the Record concerned were sold Through Normal Retail Channels and the royalty rate on any Record described in section (4) of this sentence will be 2/3 of the royalty that would apply if the Record concerned were sold Through Normal Retail Channels: (1) any catalog Phonograph Record sold by the special products operations of Universal or its Licensees ("SPO's") to educational institutions or libraries, or to other SPO clients for their promotion or sales incentive purposes (but not for sale to the general public Through Normal Retail Channels); (2) any Phonograph Record sold outside the United States by Universal or its Licensees in the country concerned in conjunction with a substantial radio or television advertising campaign during the calendar semi-annual period in which that campaign begins or the next such period provided the aforesaid reduction of the royalty rate will only apply until Universal recovers ½ of the cost of the campaign from the 1/3 reduction in royalties; (3) any non-catalog Phonograph Record created on a custom basis for SPO clients (the royalty on any Record described in section (3) will be computed on the basis of the SPO's actual sales price less all taxes and Container Charges); and (4) any Phonograph Records sold by Universal in the United States through direct mail or phone order or other mail order distribution method (but not direct mail of a physical unit ordered from an Internet site, for which the otherwise applicable royalty shall apply).

JLN-23-1999  01:29                                                                                      P.03/21

    (b)    In respect of any Master Recording:  (1) leased by Universal or its Licensees to others for their distribution of Phonograph Records in the United States; (2) embodied on Phonograph Records sold by Universal's Licensees in the United States through a direct mail or mail order distribution method (including, without limitation, through so-called "record clubs"); or (3) embodied on Phonograph Records sold by Universal's Licensees in the United States through retail stores in connection with special radio or television advertisements (sometimes referred to as "key-outlet marketing"), Universal will pay you ███████████ of Universal's net receipts with respect to such exploitation. ("Net receipts", in the preceding sentence, means Universal's gross receipts as computed after deduction of all AFM, union and other applicable third party payments actually made or incurred; provided, however, if Universal's net receipts from such sales are inclusive of manufacturing costs and/or Mechanical Royalties for the applicable Record[s] hereunder, your royalty shall ███████████ of the otherwise applicable royalty rate hereunder.)  If another artist, a producer, or any other Person is entitled to royalties on sales of such Records, that payment will be divided among you in the same ratio as that among your respective basic royalty percentage rates.  No royalties shall be payable with respect to Records given away as "bonus" or "free" Records as a result of joining a record club or purchasing a number of Records from a record club or in connection with any introductory, incentive or other offer made by a record club; provided, however, for the purposes hereof, the number of such non-royalty Records shall not exceed ███████████ of the total number of Records distributed through such means.

    (c)    (1)    If Universal or its Distributor sells Records directly (and not through other Licensees) via television and/or radio advertisements in the United States, then such sales for the purposes of subparagraph 1.01(a) hereof shall be deemed USNRC Net Sales and, accordingly, you shall be paid royalties with respect thereto in accordance with subparagraph 1.01(a) hereof, but only with respect to ███████████ of such Net Sales, less the applicable Container Charge.

    (2)    If Universal sells or licenses third parties to sell Records via telephone, satellite, cable or other direct transmission to the consumer over wire or through the air (e.g. downloading), the royalty rate will be the otherwise applicable royalty rate prescribed in paragraph 1.01.

    1.03.    (a)    The royalty rate on any Budget Record will be ███████████ of the applicable royalty rate prescribed in paragraph 1.01.  The royalty rate on any or any Premium Record will be ███████████ of the applicable royalty rate prescribed in paragraph 1.01.  The royalty rate on any Mid-price Record or any Record sold for distribution through military exchange channels will be ███████████ of the applicable royalty rate prescribed in paragraph 1.01. (The preceding reduction will not apply to a Budget Record sold within twenty-four (24) months, or to a Mid-price Record sold within eighteen (18) months, after the initial release of the Master Recordings concerned on Phonograph Records.)  The royalty on any Premium Record or Record sold for distribution through military exchange channels will be computed on the basis of the actual sales price (or Post Exchange list price where applicable) less all taxes and Container Charges.

Enrique Exhibit A Spanish               2                      6/22/99



(b)   (1)   The royalty on any compact disc Record will be a royalty computed at ▮▮▮▮▮▮▮▮▮▮▮▮ of the rate which would otherwise apply under this Agreement.

(2)   The royalty on any New Medium Record (excluding digital downloads for which a royalty computed at ▮▮▮▮▮▮▮▮▮▮▮▮ of the otherwise applicable rate under this Agreement shall apply) will be as ▮▮▮ of the rate which would otherwise apply under this Agreement during a two (2) year "introductory period", the future rate to be negotiated in good faith, but in no event shall such rate exceed ▮▮▮ of the otherwise applicable royalty rate provided if during any accounting period, sales of a particular New Medium configuration account for more than ▮▮▮▮▮▮▮▮▮▮▮ of the market share of phonograph records sold in all configurations during that accounting period, the royalty rate for prospective sales of Records in such New Medium configuration, commencing on the first day of the following semi-annual accounting period, shall be ▮▮▮▮▮▮▮▮▮▮▮▮ of the rate which would otherwise apply under this Agreement.

(c)   The royalty rate on a Multiple Record Set will be the otherwise applicable royalty rate multiplied by a fraction (which shall in no event be larger than one (1)), the numerator of which is the SRLP of such Multiple Record Set in the applicable configuration in the territory where the Multiple Record Set is sold and the denominator of which is Universal's then-prevailing SRLP for Universal's newly-released Top-line Albums in such configuration in the applicable territory multiplied by the number of Records contained in such Multiple Record Set.

1.04.   In respect of Phonograph Records derived from Master Recordings furnished by Universal or its Licensees to others for their manufacture and distribution of Records outside the United States, Universal will pay ▮▮▮▮▮▮▮▮▮▮▮ of the net receipts derived from those transactions by Universal after deduction from Universal's gross receipts of all Mechanical Royalties, AFM, union and all other applicable third party payments (which payments will be apportioned as provided in paragraph 1.02 if another artist, a producer, or any other Person is entitled to royalties in respect of such Records).

1.05.   If Universal authorizes the use of any Master Recording made under this Agreement on a flat fee basis, royalty rate or cent rate basis for any type of use not specifically covered elsewhere in this Article 1, (such as, but not limited to, use in a commercial or motion picture other than a Covered Video), it will credit your royalty account with an amount equal to fifty percent (50%) of its net receipts attributable directly to that use. "Net receipts", in the preceding sentence, means Universal's gross receipts as computed after deduction of all payments required to be made by Universal to others in connection with those uses (for example, re-use payments under Universal's or Interscope's agreements with the American Federation of Musicians).  If another recording artist, a producer, or any other Person is entitled to royalties on such uses, the amount to be credited under this paragraph will be apportioned in the same ratio as that among your respective

basic royalty percentages.  If any item of such receipts is attributable to Master Recordings made under this Agreement and other Master Recordings, the amount of that item includible in gross receipts under this paragraph will be computed by apportionment on the basis of the number of Master Recordings involved.

1.06.    Universal will pay you royalties in connection with commercial uses of Audiovisual Records (including for sales of Audiovisual Records which contain Covered Videos) on terms to be negotiated in good faith at the time the parties mutually agree to produce same.

## 2.    MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding anything to the contrary contained in paragraph 4 of the Agreement to which this Exhibit A is attached or Article 1 hereof:

2.01.    In respect of Joint Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the total number of royalty artists whose Performances are embodied on a Joint Recording.

2.02.    The royalty rate on a Phonograph Record embodying Master Recordings made hereunder together with other Master Recordings will be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of Sides embodying Master Recordings made hereunder and the denominator of which is the total number of royalty-bearing Sides contained on such Record.

2.03.    Except as otherwise provided in paragraph 2.04, no royalties will be due or payable in respect of Phonograph Records:  (a) sold (for less than ███ of Universal's posted wholesale price), distributed or furnished on a no-charge basis by Universal or its Licensees for promotional purposes (including, without limitation, Records to disc jockeys, publishers, motion picture companies, television and radio stations, and other customary recipients of promotional Records) or to Universal's or its Licensees' employees and relatives; (b) sold, distributed or furnished on a no-charge basis to members, applicants or other participants in any "record club" or other direct mail distribution method (subject to subparagraph 1.02(b) above); (c) sold at close-out prices or as surplus, overstock or scrap; (d) sold as cutouts after the listing of such Records has been deleted from the catalog of Universal or its Licensees; (e) given away or shipped as "free", "no charge" or "bonus" Records (whether or not intended for resale); and (f) sold at a discount from the Record's posted wholesale list price (but for more than ███ of such price), whether or not intended for resale.  In determining the number of Records as to which no royalties are payable pursuant to subparagraph (f) above, Universal shall multiply the percentage amount of such discount by the number of Records sold at such discount.  No royalties will be payable to you on Records containing Recordings of not more than two (2) Master Recordings made hereunder sold as "samplers" at a price which is ████████ or less of the SRLP of

[23-Jun-99 01:37A]

Universal's or Interscope's then current newly-released Top-line Records, on Records intended for free distribution as "samplers" to automobile or audio and/or audiovisual equipment purchasers (whether or not postage, handling, or similar charges are made), or distributed for use on transportation carriers.

2.04.   Those Records distributed pursuant to subparagraphs 2.03(e) and (f) are herein referred to as "Free Goods". Universal shall have the right to distribute Free Goods for Albums in the United States not in excess of ███████████ of the aggregate units of all Top-line Albums distributed under this Agreement. In addition, from time to time, Universal or its Distributor, jointly or separately, shall have the right to conduct special sales programs of limited duration which include the distribution of Free Goods in excess of the limitation set forth in the preceding sentence ("Special Free Goods"), but not in the United States in excess of ███████████ of the aggregate units of all Albums distributed under this Agreement. Outside the United States the Free Goods limits shall be in accordance with the current levels (as may vary from time to time) applied by our affiliates in the applicable countries (a list of the current levels are set out in Schedule A attached hereto). The limits set forth on the attached Exhibit A include both standard and Special Free Goods.  If Universal distributes Free Goods in excess of the foregoing limitations, Universal will not be in breach hereof, but Universal will pay you your normal royalty on such excess.

2.05.   If legislation requiring the payment of copyright royalties for the public performance of Phonograph Records is enacted in the United States and Universal receives such royalties with respect to Master Recordings produced under this Agreement, and you do not receive or waive any similar payment from anyone other than Universal, then Universal will credit your royalty account with that portion of such royalties as required (e.g., by law, applicable collective bargaining agreement, etc.), less any portion thereof which is payable by Universal to producers or any other Person; provided, that if you receive payment in respect thereof from any other Person, then Universal shall credit your royalty account with such amount as shall provide you with a total (including the share received by you from any other Person) ███████████ of the aggregate amount paid to Universal, less any portion thereof which is payable by Universal to any producers or any other Person.  Outside of the United States, if we receive payment of public performance royalties that are otherwise payable to you, we shall remit same to you.

3.     ROYALTY ACCOUNTINGS

3.01.   Universal will compute your royalties as of each June 30th and December 31st (or such other semi-annual periods as Universal may elect in its sole discretion) for the prior six (6) months, in respect of each such six-month period in which there are sales or returns of Records or any other transactions on which royalties are payable to you, or liquidations of reserves established previously. Within three (3) months following the end of each such semi-annual period, Universal will send you a statement covering those royalties and will pay you any royalties which are due after deducting unrecouped Advances and chargeable costs under this Agreement and such amount, if any, which

Universal may be required to withhold pursuant to any applicable statute, regulations, treaty or law. Royalties payable for any semi-annual accounting period will not be charged with Advances paid under paragraph 3 of the Agreement to which this Exhibit is annexed after the end of the accounting period for an MRC or Overcall Album Delivered within the time prescribed in subparagraph 2(d) of the Agreement to which this Exhibit is annexed after the expiration of the semi-annual accounting period for which such statement is rendered. After the term, no royalty statements shall be required for periods during which no additional royalties accrue unless you give Universal a written request therefor before the expiration of the semi-annual accounting period to which the desired royalty statement relates. In computing the number of Records sold, only Records for which Universal has been paid shall be deemed sold, and Universal shall have the right to deduct returns and credits of any nature and to withhold reasonable reserves therefor (but with respect to Albums in no event more than ▮▮▮▮ of units shipped) from payments otherwise due you. Each royalty reserve against anticipated returns and credits will be liquidated not later than the end of the fourth semi-annual accounting period following the accounting period during which it is established. If Universal makes any overpayment to you, you will reimburse Universal for it; Universal also may deduct it from any payments due or becoming due to you. If Universal pays you any royalties on Records which are returned later, those royalties will be considered overpayments. Universal may at any time elect to utilize a different method of computing royalties so long as such method does not decrease the net monies received by or credited to you hereunder.

3.02. Universal will compute your royalties for any sale in the same national currency in which Universal's Licensee pays Universal for that sale, and Universal will credit those royalties to your account at the same rate of exchange at which the Licensee pays Universal. Such royalties will be converted into U.S. dollars at the rate of exchange on the date credited to your account (or if royalties are payable Universal may use the exchange rate as of the date of payment). For purposes of accounting to you, Universal will treat any sale as a sale made during the same six-month period in which Universal receives its Licensee's accounting and payment for that sale. (For the purposes of this paragraph, any royalties credited by a Licensee to Universal's account but charged in recoupment of a prior advance made to Universal and retained by the Licensee by reason of that charge will be deemed paid to Universal and received by it when it receives the Licensee's accounting reflecting the credit and charge concerned.) If any Universal Licensee deducts any taxes from its payments to Universal, Universal may deduct a proportionate amount of those taxes from your royalties. If, after a final audit of its tax returns, Universal is allowed a credit against its U.S. or Dutch income taxes for all or a portion of any taxes withheld by an Universal Licensee from its royalty remittances to Universal which were deducted from your royalties, the amount of such tax credit attributable to your royalties will be credited to your account. The amount of the tax credit to be credited to your account will be determined by Universal; such determination will be conclusive and you will not be entitled to examine Universal's tax returns or any portion of them. If any law, any government ruling, or any other restriction affects the amount of the payments which an Universal Licensee can remit to Universal, Universal may deduct from your royalties an amount proportionate to the reduction in the Licensee's remittances to

Universal. If Universal cannot collect payment in the Netherlands in U.S. Dollars or Dutch Guilders for a sale in any country it will not be required to account to you for that sale, except as provided in the next sentence. Universal will, at your request and at your expense, deduct from the monies so blocked and deposit in a foreign depository the equivalent in local currency of the royalties which would be payable to you on the foreign sales concerned, to the extent such monies are available for that purpose, and only to the extent to which your royalty account is then in a fully recouped position. All such deposits will constitute royalty payments to you for accounting purposes.

3.03.   Universal will maintain books and records which report the sales or other exploitations of Phonograph Records and Master Recordings hereunder on which royalties are payable to you. You may, at your own expense, designate a certified public accountant ("CPA") to examine those books and records, as provided in this paragraph only. Such examination: (a) may be made only for the purpose of verifying the accuracy of the statements sent to you under paragraph 3.01; (b) may be made for a particular statement only once and only within three (3) years after the date when Universal sends you that statement; and (c) may be made only during Universal's usual business hours, and at the place where it keeps the books and records to be examined, and upon reasonable notice to Universal. (Universal will be deemed conclusively to have sent you each statement on the date prescribed in paragraph 3.01 unless you notify Universal otherwise, with respect to any statement, within ninety (90) days after that date.) No examination may be made of any manufacturing records or any other records that do not specifically report sales or other distributions of Phonograph Records or other transactions on which royalties are payable to you. Further, such examination shall be conditioned upon the CPA's written agreement to Universal that the CPA will not voluntarily disclose any findings to any Person other than you, your attorney or other advisers.

3.04.   If you have any objections to a royalty statement, you will give Universal specific notice of that objection and your reasons for it within three (3) years after the date that Universal is deemed to have sent you that statement under paragraph 3.03. Each royalty statement will become conclusively binding on you at the end of that three-year period, and you will no longer have any right to make any other objections to it. You will not have the right to sue Universal in connection with any royalty accounting, or to sue Universal for royalties on Records sold or receipts derived by Universal during the period a royalty accounting covers, unless you commence the suit within six (6) months after the end of that three-year period. If you commence suit on any controversy or claim concerning royalty accountings rendered to you under this Agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing. Your recovery of any such royalties will be the sole remedy available to you by reason of any claim related to Universal's royalty accountings. Without limiting the generality of the preceding sentence, you will not have any right to seek termination of this Agreement or avoid the performance of your obligations under it by reason of any such claim. The preceding three sentences

will not apply to any item in a royalty accounting if you establish that the item was fraudulently misstated.

4.   **LICENSES FOR MUSICAL COMPOSITIONS**

4.01.   (a)   (1)   You grant to Universal and its Licensees and their designees an irrevocable license, under copyright, to reproduce each Controlled Composition on Phonograph Records of Master Recordings made under this Agreement, other than Audiovisual Records, and to distribute them in the United States and Canada.

(2)   For that license, Universal will pay Mechanical Royalties, on the basis of Net Sales, at the rates set forth in paragraph 5 of the Agreement to which this Exhibit is attached. If the Composition is an arranged version of a public domain work, the Mechanical Royalty on it will be ▮▮▮▮▮▮▮▮▮ of the amount fixed in subsection (i) or (ii) above, unless a different rate applies under section 4.01(a)(4) below. No Mechanical Royalties will be payable for any Records described in paragraph 2.03. Notwithstanding the preceding sentence, Universal shall pay Mechanical Royalties pursuant to this subparagraph 4.01(a) with respect to Controlled Compositions embodied on Albums hereunder on ▮▮▮▮▮▮▮▮ of those units of such Albums distributed in the United States as Standard Free Goods, but Universal shall not be obligated to pay Mechanical Royalties on any such Albums distributed as Special Free Goods.

(3)   If a Person not in any of the categories referred to in paragraph 5.12 holds a joint ownership interest ("Independent Interest") in a Controlled Composition, Universal will have the right, at its election, to pay or credit directly to that Person a share of the Mechanical Royalty payable with respect to that Composition under subsection 4.01(a)(2)(i), proportionate to the amount of the Independent Interest, and increased proportionately on the basis of the full amount of the minimum statutory rate applicable (for example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The amount of the proportionate increase of each such payment or credit will constitute an Advance and will be recoupable from all monies becoming payable by Universal to you hereunder.

(4)   If ASCAP or BMI accords regular performance credit for any Controlled Composition which is an arranged version of a public domain work, the Mechanical Royalty rate on that Composition will be apportioned according to the same ratio used by ASCAP or BMI in determining the performance credit. Universal will not be required to pay you at that rate unless you furnish it with satisfactory evidence of that ratio.

(b)   (1)   The total Mechanical Royalty for all Compositions on any Album, including Controlled Compositions, will be as set forth in paragraph 5 of the Agreement.

(2)   The maximum Mechanical Royalty under this subparagraph (b) on a Multiple Record Set will be the same amount prescribed in section 4.01(b)(1),

multiplied by a fraction, the numerator of which is the SRLP of such Multiple Record Set in the applicable configuration in the United States and the denominator of which is Universal's then-prevailing SRLP for Universal's newly-released Top-line Albums in such configuration in the United States.

(c)     Universal will compute Mechanical Royalties on Controlled Compositions as of each February 28th (or 29th, if applicable), May 31st, August 31st and November 30th (or such other quarter-annual periods as Universal may elect in its sole discretion) for the prior three (3) months, in respect of each quarter-annual period in which there are sales or returns of Records on which Mechanical Royalties are payable to you, or liquidations of Mechanical Royalty reserves established previously.  On the 15th day of the second month following the end of each such quarter-annual period, Universal will send a statement covering those Mechanical Royalties, less a reasonable reserve against anticipated returns and credits, and will pay any net Mechanical Royalties which are due. Mechanical Royalty reserves maintained by Universal against anticipated returns and credits will not be held for an unreasonable period of time; retention of a reserve for two (2) years after it is established will not be considered unreasonable in any case.  If Universal makes any overpayment of Mechanical Royalties to you you will reimburse Universal for it; Universal may also recoup it from any payments due or becoming due to you hereunder. If Universal pays any Mechanical Royalties on Records which are returned later, those Mechanical Royalties will be considered overpayments.  If the total amount of the Mechanical Royalties which Universal pays on any Record consisting of Master Recordings made under this Agreement (including Mechanical Royalties for Compositions which are not Controlled Compositions) is higher than the limit fixed for that Record under subparagraph 4.01(b), that excess amount will be considered an overpayment also. Paragraphs 3.03 and 3.04 will apply to Mechanical Royalty accountings.

4.02.   You also grant to Universal and its Licensees and their designees an irrevocable license under copyright to reproduce each Controlled Composition in Covered Videos and Audiovisual Records, to reproduce those Covered Videos and Audiovisual Records, distribute them, and perform them in any manner (including, without limitation, publicly and for profit), to manufacture and distribute Audiovisual Records and other copies of them, and to exploit them otherwise, by any method and in any form known now or in the future, throughout the world, and to authorize others to do so.  Universal will not be required to make any payment in connection with those uses, and that license will apply whether or not Universal receives any payment in connection with any use of any Covered Video or Audiovisual Record.  If any exhibition of a Covered Video or Audiovisual Record is also authorized under another license (such as a public performance license granted by ASCAP or BMI), that exhibition will be deemed authorized by that license instead of this Agreement.  (In all events, Universal and its Licensees will have no liability by reason of any such exhibition.)

4.03.   (a)     If any Recordings made under this Agreement contain copyrighted Compositions which are not Controlled Compositions, you will use reasonable efforts to obtain licenses covering those Compositions for Universal's benefit on the same terms as

those which apply to Controlled Compositions under this Article 4.  In all events, you will guarantee the availability of licenses covering them for the United States providing for royalties at the statutory rate applicable to the use of Compositions on phonorecords under the compulsory license provisions of the United States copyright law, and licenses for them for Canada providing for royalties at the rates then prevailing in Canada on a general basis with respect to the use of Compositions on Standard Records and subparagraph 4.01(b) will continue to apply.

(b)     You will cause the issuance of effective licenses, under copyright and otherwise, to reproduce each Controlled Composition on Phonograph Records and distribute those Records outside the United States and Canada, on terms not less favorable to Universal or its Licensees than the terms prevailing on a general basis in the country concerned with respect to the use of Compositions on comparable Records.

4.04.   You warrant and represent that the "Schedule of Publishers" appended to this Agreement is a complete list of the music publishers in which you have a direct or indirect interest.  You will notify Universal promptly of each additional music publisher in which you acquire any such interest and of every other change required to keep the list currently accurate.

4.05.   Neither you, nor any Person deriving rights from you, will authorize the use of any Controlled Composition in a radio or television commercial or any other advertising or promotional matter, unless you first require the Person authorized to make the use concerned to agree in writing, for Universal's benefit, that the use will not involve a "sound-alike" Recording resembling a Performance of that Composition by you.   (A "sound-alike" Recording is a different Recording which imitates or simulates the Recording concerned by using a substantially similar musical arrangement or otherwise.)

4.06.   Subject to the provisions of section 4.01(a)(3) above, if the copyright in any Controlled Compositions is owned or controlled by a Person other than you, you shall cause that Person to grant Universal and its Licensees and their designees the same rights as you are required to grant to Universal and its Licensees pursuant to this Article 3.  Any assignment, license or other agreement made with respect to any Controlled Composition shall be subject to the terms hereof.

4.07.   You also grant to Universal and its Licensees and their designees an irrevocable license under copyright to print and reproduce, at their election, the title and lyrics to any Controlled Composition on Album Artwork and in connection with Covered Videos or Audiovisual Records, and the packaging therefor, throughout the world in perpetuity, without payment to you or any other Person of any monies or other consideration in connection therewith.

5.     **DEFINITIONS**

JUN-23-1999  01:33                                                                          P.12/21

5.01.   "Master Recording" and "Recording" - every recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Phonograph Records.

5.02.   "Inception of Recording" - the first recording of Performances or other sounds with a view to the eventual fixation of a Master Recording.  "Master Recordings from the Inception of Recording" include, without limitation, all rehearsal recordings, "outtakes", and other preliminary or alternate versions of sound recordings which are created during the production of Master Recordings made under this Agreement.

5.03.   "Performance" (whether audio only or audiovisual) - means singing, speaking, conducting or playing an instrument, alone or with others.

5.04.   "Person" - any natural person, legal entity, or other organized group of persons or entities, or legal successors or representatives of the foregoing.  (All pronouns, whether personal or impersonal, which refer to Persons include natural persons and other Persons.)

5.05.   (a)   "Records" and "Phonograph Records" - all forms of reproductions (including, sound alone and audiovisual reproductions), now or hereafter known, manufactured or distributed primarily for home use, institutional use (e.g., library or school), juke box use, or use in means of transportation (including, without limitation, video games and any software media or transmission of such reproductions via telephone, cable, satellite or other transmissions to consumers directly into the home).

(b)   "Audiovisual Record" - a Phonograph Record including sound accompanied by visual images intended primarily for home consumer or institutional (e.g., library or school) use, jukebox use or use in means of transportation, including, without limitation, videocassettes, laser discs, videodiscs or other media or devices now or hereafter known that, among other things, allow consumers to control the viewing of, or to interact with, the Audiovisual Record, including, without limitation, transmissions to consumers directly into the home that enable consumers to view such Records at any time. Audiovisual Records are not Albums, Singles, Twelve-Inch Singles, or Extended Play Records.

5.06.   "Royalty Base Price" - The Royalty Base Price for Records (other than Audiovisual Records) shall be the Suggested Retail List Price applicable to the Phonograph Records concerned, less all excise, purchase, value added or similar taxes included in the price and less the applicable Container Charge. The Royalty Base Price for Records (other than Audiovisual Records) sold through any so-called "record club" will be the same as that for the identical Records sold Through Normal Retail Channels in the territory concerned. The Royalty Base Price for Audiovisual Records manufactured and distributed by Universal or its Licensees shall be Universal's or its Licensee's published wholesale price as

23-Jun-99 01:37A

of the commencement of the accounting period concerned, less all excise, purchase value added or similar taxes included in the price and less the applicable Container Charge.

5.07.  "Container Charges" - the applicable percentage, specified below, of the Suggested Retail List Price applicable to the Records concerned:



(a)  Audiovisual Records -

(b)  Compact disc Records/New Medium Records -

(c)  Other Records -  on analog vinyl-disc Records in single-fold packaging; on analog vinyl-disc Records in double-fold packaging and on analog Records in non-vinyl disc configurations.

Container Charges will not be deducted for Singles packaged only in stock paper sleeves.

5.08.  "Net Sales" - of gross sales, less returns, credits and reserves against anticipated returns and credits. Returns will be apportioned between records sold and "free goods" in the same ratio in which Universal's customer's account is credited.

5.09.  "Suggested Retail List Price" or "SRLP":

(a)  "Suggested Retail List Price" or "SRLP":

(i)  With respect to Records sold for distribution in the United States:

(aa)  Other than with respect to Compact Discs, Digital Compact Cassettes, Mini-Discs, other digital configurations, and any and all new technologies: Universal's published suggested retail list price in the United States during the applicable accounting period for the computation of royalties to be made hereunder, it being understood that a separate calculation of the suggested retail list price will be made for each price configuration of Records manufactured and sold by Universal.

(bb)  With respect to Compact Discs, Digital Compact Cassettes, Mini-Discs, other digital configurations, and any and all new technologies: of Universal's lowest published wholesale price in the category of sale concerned. In the event such wholesale price changes during an accounting period, the applicable wholesale price for the entire accounting period will be deemed to be the average lowest daily wholesale price during the period Notwithstanding anything to the contrary expressed or implied herein, the wholesale price utilized hereunder for royalty purposes shall not reflect a discount in respect of the cost of any "free goods" (solely as defined herein). For example: as of the date hereof, on the price sheet given by

Enrique Exhibit A Spanish                    12                    6/22/99

JUN-23-1999  01:34                                                                    P.14/21

Universal's Distributor to retailers the price listed for the price category of the majority of our newly released compact disc Records lists a price of  As this price is net of Standard Free Goods, the wholesale price for the purpose of this subsection (i.e., calculating royalties payable hereunder) would be ███ divided by ██ or ███ It is this figure ███ that would be multiplied by ███

(ii)   With respect to Records sold for distribution outside the United States: the retail equivalent price utilized by Universal's licensee in computing monies to be paid to Universal for the Record concerned, provided that in any country where there is no actual suggested or applicable retail list price, the SRLP will be deemed to be the price established by Universal or its licensee(s) in conformity with the general practice of the recording industry in such country, provided if a retail-related price can not be established in a particular country, the price shall be that amount equal to the published price to dealers payable by the largest category of Universal customers in the normal course of business with respect to Records sold for distribution during the applicable semi-annual accounting period, multiplied by ███████████ In the event such general practice or similar base price includes an adjustment for either container deductions, free goods, or taxes, such adjustments will be excluded therefrom, but this will not prevent us from deducting the container deductions, free goods, or taxes otherwise specifically permitted to be deducted elsewhere in this exhibit to the Agreement.

(iii)   Notwithstanding anything to the contrary herein, the Suggested Retail List Price with respect to Records sold by Universal directly to a consumer through direct response, or through transmission via telephone, cable, satellite or other transmissions to consumers over wire or air directly into the home will be Universal's actual sales price of such Records (but in the US, ███ of the such actual sales price). The ███ referred to in the preceding parenthetical is intended to be in lieu of Free Goods other than Special Free Goods. The total of such non-Special Free Goods and the reduction in the preceding parenthetical shall not in the aggregate exceed ███ Notwithstanding the foregoing, after the first two (2) years from the date hereof, at the written request of either you or Universal (not to be given more than once during the term hereof) Universal agrees to negotiate with you in good faith concerning the calculation of royalties payable to you hereunder with respect to Records sold by Universal directly to a consumer through transmission via telephone, cable, satellite or other transmissions to consumers over wire or air directly into the home (sometimes referred to herein as "Digital Download Records"), taking into consideration the manner in which Interscope is then calculating royalties for artists signed after the date hereof or whose contracts have been renegotiated after the date hereof and in either event whose contract provide a base royalty rate of ███ of SRLP or higher. No failure by the parties to reach an agreement after such good faith negotiation shall constitute a breach of this Agreement, nor shall such failure result in the loss of or otherwise affect any of Universal's rights under this Agreement.

23-Jun-99 01:37A

(c)     Universal or its Licensees may at some time change the method by which it computes royalties in the United States from a retail basis to some other basis (the "New Basis"), such as, without limitation, a wholesale basis. The New Basis will replace the then-current Suggested Retail List Price and the royalty rates shall be adjusted to the appropriate royalty which would be applied to the New Basis so that the dollars and cents royalty amounts payable with respect to the Record concerned would be the same as that which was payable immediately prior to such New Basis. If a Record was not theretofore sold in a particular configuration or in a particular price-series (e.g., a Budget Record), the adjusted royalty rate for any such configuration shall be the adjusted royalty rate on Top-line Records multiplied by a fraction, the numerator of which is the royalty rate for sales in the configuration (or price-series) concerned prior to the New Basis and the denominator of which is the royalty rate for sales of Top-line Records in the applicable configuration prior to the New Basis. If there are other adjustments made by Universal or its Licensees that would otherwise make the New Basis more favorable (a particular example of which might be the distribution of smaller quantities of free goods than theretofore distributed) then the benefits of such other adjustments will be taken into consideration in adjusting the royalty rate.

(d)     Royalties will be calculated separately with respect to each price series in which units of a particular Record release are sold or returned during the semi-annual accounting period concerned. References to published prices in this section refer to those in effect at the commencement of the accounting period concerned.

5.10.   (a)     "Advance" - a prepayment of royalties. Universal may recoup Advances from royalties to be paid to or on your behalf pursuant to this Agreement and the English Album Agreement. Advances paid under paragraph 3 of the Agreement to which this exhibit is annexed will not be returnable ~~subject to the 7th and 8th sentences of subparagraph 12(c) of the Agreement to which this exhibit is annexed and provided the foregoing shall not operate to affect your indemnification obligations.~~

(b)     (1)     ▆▆▆▆▆▆▆▆▆ of the production and acquisition costs incurred in connection with any Covered Video will be recoupable from your royalties on sales of Records which do not reproduce visual images ("audio royalties") under subparagraph 5.02(a), and ▆▆▆▆▆▆▆▆▆ of such costs will be recoupable from monies otherwise payable to you from the exploitation of such Covered Videos pursuant to paragraph 1.06 above. If any such costs are recouped from audio royalties and additional royalties accrue under paragraph 1.06 subsequently, the latter royalties will be applied in recoupment of those costs and the amount of those audio royalties which were previously applied against those costs will be credited back to your account.

(2)     All costs incurred in connection with creating the so-called "enhanced" or multimedia portion (including without limitation, videos, photography, graphics, technology, etc.) of an enhanced CD, CD +, CD Rom, DVD or any other similar configuration (whether now known or hereafter created embodying Masters hereunder (the

"Enhanced Costs") will be recoupable from monies (excluding mechanical royalties) otherwise payable to you hereunder.

5.11.   "Composition" - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.  Recordings of more than one (1) arrangement or version of the same Composition, reproduced on the same Record, will be considered, collectively, a recording of one (1) Composition for all purposes under this Agreement.

5.12.   "Controlled Composition" - a Composition wholly or partly written, owned or controlled by you, a producer, or any Person in which you, or a producer has a direct or indirect interest.

5.13.   (a)     "Album" -a sufficient number of Masters embodying Artist's Performances to comprise one (1) or more compact disc Records, or the equivalent, of not less than thirty-six (36) (but for Spanish Albums thirty-two (32) minutes provided same contains six Sides of not less than 3 minutes each) minutes of playing time and containing at least ten (10) different Compositions.

(b)     "Single" - a vinyl-disc Record not more than seven (7") inches in diameter, or the equivalent in a non-vinyl-disc configuration, which contains Recordings of not more than two (2) Compositions.

(c)     "Twelve-Inch Single" - a twelve-inch (12") vinyl-disc Record, or the equivalent in a non-vinyl-disc configuration, which contains Recordings of not more than three (3) Compositions and does not constitute an Album.

(d)     "Extended Play Record" - a Record which contains Recordings of four (4) or more Compositions but does not constitute an Album.

5.14.   "Side" - a Master Recording of a continuous Performance of a particular arrangement or version of a Composition, not less than two and one-quarter (2-1/4) minutes in playing time.   If any Album (or other group of Master Recordings) Delivered to Universal in fulfillment of a Recording Commitment expressed as a number of Sides includes Master Recordings of more than one (1) arrangement or version of any Composition, all of those Recordings will be deemed to constitute one (1) Side.

5.15.   "Joint Recording" - any Master Recording embodying your Performance and any Performance by another artist with respect to which Universal is obligated to pay royalties.

5.16.   "Sales Through Normal Retail Channels" - Net Sales other than as described in paragraphs 1.02, 1.03(a), 1.04, 1.05, 1.06, 2.03 and 2.04.   Sales via "digital downloading" and sales by Universal in the United States through direct mail or phone

Enrique Exhibit A Spanish                    15                              6/22/99

order or other mail order distribution solely of a physical unit ordered from an Internet site are deemed included herein.

5.17.   (a)   "Licensees" - all Persons (whether or not affiliated with Universal or Universal's Distributor) to which Universal has licensed the right of sale, distribution or exploitation of Master Recordings and/or Records made hereunder, including, without limitation, Interscope Records, wholly or partly owned subsidiaries, affiliates, and other divisions of Universal or its Distributor.

(b)   "Distributor" - the record company having the exclusive right at any time to distribute Universal's newly released Records through USNRC.

5.18.   "Delivery", when used with respect to Master Recordings - means the actual receipt and acceptance by Universal of the Master Recordings concerned and all documents and other materials required to be furnished to Universal in connection with them.  Without limiting the generality of the preceding sentence, no Master Recordings will be deemed Delivered and accepted until Universal has received all of the related documentation required.  Universal will have the right to disapprove and reject any Master Recording which in Universal's reasonable, good faith opinion, is patently offensive, constitutes an obscenity, violates any law, or infringes or violates the rights of any Person, or which might subject Universal to liability or unfavorable regulatory action. A Master Recording will be considered satisfactory pursuant to the terms of paragraph 6 of the Agreement to which this Exhibit is Attached.

5.19.   "Top-line Record" - a Record released bearing the same Suggested Retail List Price as the majority (or plurality) of the Record releases in the same configuration then in initial release in Universal's or Interscope's active catalog. (For the purposes of the preceding sentence, a Record release will not be deemed in its initial release if it bears a Suggested Retail List Price lower than that which applied to it when it was first released by Universal.)

5.20.   (a)   "Budget Record" - a Record, whether or not previously released, bearing a Suggested Retail List Price which is ███████████████ or less of the Suggested Retail List Price in the country concerned applicable to the Top-line Records in the same configuration (e.g., long-playing Album, two-disc long-playing Album, Twelve-Inch Single, analog tape cassette, compact disc, Digital Download Records, etc.) released by Universal or its Licensees in the territory concerned.

(b)   "Mid-price Record" - a Record, whether or not previously released, bearing a Suggested Retail List Price in the country concerned in excess of ███████ ████████ and less than ███████████ of the Suggested Retail List Price applicable to the Top-line Record in the same configuration.

5.21.   "Multiple Record Set" - an Album which contains a sufficient number of Masters embodying Artist's Performances to comprise two (2) or more compact disc

23-Jun-99 01:37A

Records, or the equivalent, each of not less than thirty-six (36) (but for Spanish Albums thirty-two (32) minutes provided same contains six Sides of not less than 3 minutes each) minutes of playing time and each containing at least ten (10) different Compositions packaged as a single unit, or which, because of the number of Master Recordings embodied thereon or the playing time thereof, bears a Suggested Retail List Price which is greater than that of the majority of Universal's then-current releases in that particular configuration. For purposes of the Recording Commitment hereunder and for computing the applicable Recording Fund or Advance, a Multiple Record Set accepted by Universal shall be deemed only one (1) Album.

    5.22.   "Mechanical Royalties" - royalties payable to any Person for the right to reproduce and distribute copyrighted Compositions on Phonograph Records other than Audiovisual Records.

    5.23.   "Recording Costs" - all amounts representing direct expenses paid or incurred by Universal in connection with the production of finished Master Recordings under this Agreement.   Recording Costs include, without limitation all union scale payments required to be made to the Artist in connection with Recordings made hereunder, all costs of instrumental, vocal and other personnel specifically approved by Universal for the recording of such Master Recordings, all other amounts required to be paid by Universal pursuant to any applicable law or any collective bargaining agreement between Universal and any union representing Persons who render services in connection with such Master Recordings, any penalties for late payments caused by your delay in submitting union contract forms (if applicable), invoices or other similar forms (which fees shall also be reimbursable by you upon demand), travel (excluding travel for Universal personnel unless they are producing), rehearsal, and equipment rental and cartage expenses, advances to producers, transportation costs, hotel and living expenses approved by Universal, studio and engineering charges in connection with Universal's facilities and personnel or otherwise, all costs and expenses of obtaining rights to all samples of Master Recordings, selections and other materials embodied in Master Recordings hereunder (including, without limitation, all advances, license fees, attorneys' fees and clearing house fees), all costs of mastering, remastering, remixing and/or "sweetening" and all costs necessary to prepare Master Recordings for release on digital media.   Recording Costs do not include the costs of producing metal parts, but include all studio and engineering charges or other costs incurred in preparing Master Recordings for the production of metal parts.   (Metal parts include lacquer, copper, and other equivalent masters.)

    5.24.   "Special Packaging Costs" - costs incurred by Universal in creating and producing Album covers, sleeves, and other packaging elements, in excess of Universal's then-standard costs for Interscope's superstar artists for design of artwork (including expenses for reproduction rights), engraving, separations and then-standard packaging manufacturing costs.   If a design submitted by you would result in Special Packaging Costs, Universal will give you a reasonable opportunity to change the artwork to come within Universal's then-standard costs for Interscope's superstar artists for design of artwork prior to incurring same.

5.25.   (a)   "New Medium" Records - Records (other than Audiovisual Records) in any software medium (including, without limitation, "digital audio tape", "digital compact cassette" and "Mini-Disc" and transmission directly into the home or "downloading", i.e., Digital Download Records) in which recorded music is not in general commercial distribution in the United States as of January 1, 1999.

(b)   "Standard" Records, units, etc. - Records other than New Medium Records and Audiovisual Records.

5.26.   "Covered Video" - an audiovisual work owned or controlled by Universal, the soundtrack of which consists primarily of one (1) or more Master Recordings subject to this Agreement.

5.27.   "Featured Countries" - the United States, Mexico, Spain, Argentina, Chile and Brazil.



# EXHIBIT A

**MAXIMUM PERMITTED FREE GOODS**

ARGENTINA
AUSTRALIA

AUSTRIA
BELGIUM
BRAZIL
CANADA

CHILE
CZECH REPUBLIC
DENMARK

FINLAND
FRANCE
GERMANY
HONG KONG
HUNGARY
ITALY
JAPAN
MALAYSIA
MEXICO
NETHERLANDS
NEW ZEALAND
NORWAY
PHILIPPINES
POLAND

PORTUGAL
RUSSIA
SINGAPORE
SLOVAKIA
SOUTH AFRICA
SOUTH KOREA
SPAIN
SWEDEN
SWITZERLAND
TAIWAN
THAILAND
UK

VENEZUELA



28

## SCHEDULE OF PUBLISHERS

EMI MUSIC PUBLISHING