# EXHIBIT 2

JUN-23-1999  01:02

Agreement made as of the 20th day of May, 1999 between Interscope Records, 10900 Wilshire Boulevard, Suite 1230, Los Angeles, California, 90024, a California general partnership (hereinafter "Interscope" or "us") and Enrique Iglesias c/o Ziffren Brittenham Branca & Fischer, 1801 Century Park West, Los Angeles, California 90067, Attention: John Branca, Esq. (hereinafter referred to as "you" or "Artist"), for you to render your exclusive recording services (except as otherwise provided herein with respect to the "Spanish Album Agreement" as further set forth hereinbelow) to us on the terms set forth herein. The royalty provisions to be applied herein and the definitions of the terms used herein are set forth in the Exhibit A attached hereto and incorporated herein by this reference.

Reference is hereby made to the agreement of even date herewith entered into between you and our affiliate Universal International Records BV (the "Spanish Album Agreement") with respect to your rendering your exclusive services in connection with delivering not less than two (2) nor more than four (4) Albums recorded solely in the Spanish language (hereinafter the "Spanish Albums").

    1.    Territory:    The Universe.

    1A.    Term: The term of this Agreement shall commence upon the date hereof and shall end upon the date the later of (i) your Delivery of the second MRC Album (as defined herein) or if applicable the last "Overcall Album" as further set forth below and (ii) the Delivery of the last Album under the Spanish Album Agreement. You warrant, represent, and agree that, commencing at the end of the Term of this Agreement and for a nine (9) month period following the later of (i) the release of the second MRC Album or if applicable the last "Overcall Album" and (ii) the release of the last Album under the Spanish Album Agreement you shall not cause the manufacture or distribute through any Person other than Interscope or its affiliated companies Phonograph Records consisting of Master Recordings embodying your Performances ("Post Term Exclusivity Period"). In any agreement entered into before or during such Post Term Exclusivity Period, between you, or any other Person furnishing your services, on the one side, and any Person other than Interscope, on the other side, regarding the manufacture or distribution of Phonograph Records embodying Master Recordings of any Performance rendered by you, a recitation of the parties' compliance with the terms of this paragraph will be included for the benefit of Interscope. The foregoing shall not be applicable to the Master Recordings heretofore recorded by you pursuant to your prior exclusive recording Agreement with Fonovisa Records.

    2.    Recording Commitment:

    (a)    Interscope shall fund (as set forth in paragraph 3 below) and you commit to Deliver two (2) albums (individually and collectively referred to herein as "MRC Album(s)"). Each Album shall be recorded entirely in English except that for each Album recorded hereunder Artist shall also record a Spanish version of one of the songs recorded in English (and embodied thereon) and we shall consult with you as to whether such Spanish version shall be embodied on such applicable Album. You and Interscope shall mutually determine if a third Album (the 'first Overcall Album") or a fourth Album (the "second Overcall Album") shall be recorded by you hereunder, provided if your combined royalty

account (i.e., both hereunder and under the Spanish Album Agreement) is unrecouped in an amount in excess of ███████████████████████████ (provided we shall take in to account "pipeline income", i.e., a good faith estimate of the royalties on net sales by our affiliates that have not yet been reported to us) as of the date fifteen (15) months after the initial release in the United States of the later of the second MRC Album hereunder and the second MRC Album under the Spanish Album Agreement (as measured upon the last day of the calendar quarter-annual period during which such 15th month falls), then Interscope shall have final approval over whether the first Overcall Album shall be recorded in English and under this Agreement, it being understood that if it is not recorded in English under this Agreement it shall be recorded in Spanish under the Spanish Album Agreement. In the event that you have recorded the first Overcall Album in English and Delivered it hereunder, unless otherwise mutually determined between the parties there shall be no second Overcall Album under this Agreement (subject to the terms of the Spanish Album Agreement). If you do not record the first Overcall Album in English and Deliver it hereunder because you have instead recorded it in Spanish and Delivered it under the Spanish Album Agreement, then whether or not you are required to record the second Overcall Album in English and Deliver it hereunder or record it in Spanish and Deliver it under the Spanish Album Agreement (one of which you shall be obligated to Deliver and we or Universal shall be obligated to fund) shall be mutually determined by you and us (subject to the terms of the Spanish Album Agreement). In addition to the MRC Albums and Overcall Albums (as applicable) you shall record three (3) newly recorded Sides to be included on the "Greatest Hits" Album (hereinafter the "GH Sides") as further provided herein. The parties hereto shall mutually determine whether such GH Sides shall be recorded in English and or recorded in Spanish provided in either event same shall be Delivered hereunder (and not under the Spanish Album Agreement). For clarification purposes, as between this Agreement and the Spanish Album Agreement you shall Deliver and Interscope and Universal shall fund an aggregate of six (6) MRC/Overcall Albums and one Greatest Hits Album.

        (b)      Intentionally deleted.

        (c)      No live albums, Christmas or other seasonal albums, spoken word albums, children's albums, instrumental albums or multiple albums unless approved by Interscope in its sole unrestricted discretion. Each Album Delivered hereunder shall feature your first class performances, shall be satisfactory (as further provided in paragraph 6 below), and shall embody your featured vocal performances of selections which have not ever been previously recorded by you and released (other than "Bailamos" as further provided herein).

        (d)      The delivery schedule for each Album shall be as follows: It is the intention of the parties that you will Deliver the first MRC Album in or about early to mid - September in order to set up a fall release (provided for purposes hereof the last date to timely Deliver shall be March 31, 2000). You will Deliver each additional MRC or Overcall Album (as applicable) hereunder not earlier than twelve (12) months and not later than twenty-four (24) months after the date when you Delivered the most recent Album under the Spanish Album Agreement nor later than thirty-six (36) months after the date when you Delivered the

most recent prior MRC or Overcall Album (as applicable) hereunder.. It is acknowledged that except as otherwise provided herein, in between each MRC or Overcall (as applicable) Album Delivered hereunder you shall be Delivering an MRC or Overcall (as applicable) Album under the Spanish Album Agreement. In the event that any two (2) consecutive MRC/Overcall Albums are Delivered under this Agreement and not under the Spanish Album Agreement as is contemplated as a possibility in subparagraph 2(a) above, then (i) the required Delivery Date for the second such MRC or Overcall (as applicable) Album shall be not earlier than twelve (12) months and not later than twenty-four (24) months after the date when you Delivered the first such MRC/Overcall Album, and (ii) the Album after such two consecutive Albums shall be Delivered no later than 60 months after the preceding same language Album. Your failure to timely Deliver shall not be deemed a breach hereof unless we have notified you in writing of such failure after such due date and you fail to cure within 3 months of the date of such notice. In addition, the parties acknowledge that notwithstanding anything to the contrary in this paragraph or in the Spanish Album Agreement, it is the parties' intention that the first MRC Album under the Spanish Album Agreement shall be Delivered in the spring of 2000 (provided your failure to Deliver same in the spring of 2000 shall not be deemed a breach hereof).

3.     Advances/Recording Funds (Funds are inclusive of all recording costs and producer advances and are not recoupable from mechanical royalties):

(a)     MRC Albums and the Overcall Album (subject to subparagraphs 3(b), 3(c) and 3(g) below):



(1) The first MRC Album: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓ subject to subparagraphs 3(b)and 3(c) below. In accordance with subparagraph 3(g) below Eight Hundred and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ from each Recording Fund shall be pre-paid, leaving a balance for the first MRC Album of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ subject to subject to subparagraphs 3(b) and 3(c) below;

(2) The second MRC Album: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓ subject to subparagraphs 3(b), 3(c) below. In accordance with subparagraph 3(g) below ▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ from each Recording Fund shall be pre-paid, leaving a balance for the second MRC Album of ▓▓▓▓▓▓▓▓▓▓▓▓ subject to subparagraphs 3(b) and 3(c) below;

(3) The first Overcall Album (if any, whether it is the fifth Album recorded and Delivered in the aggregate hereunder and under the Spanish Album Agreement, or the sixth such Album because the fifth such Album was recorded in Spanish and Delivered under the

23-Jun-99  01:12A

Spanish Album Agreement) ███████████████████████ ████████████████████████████████ and subject to subparagraph 3(c) below. In accordance with subparagraph 3(g) below ███████████ ███████████████████████████████ from each Recording Fund shall be pre-paid, leaving a balance of the Recording Fund payable for the Overcall Album (if any), of ███████████ ██████████ subject to subparagraphs 3(b) and 3(c) below;

(4)  The second Overcall Album (solely in the event that both Overcall Albums are recorded in English and Delivered under this Agreement): ████████████████████████████████ ███████████ subject to subparagraph 3(c) below. ██████████ ███████████████████████████████████ of the paid pursuant to subparagraph 3(g) of the Spanish Album Agreement will be deemed to be a pre-payment of such Recording Fund leaving a balance of the Recording Fund payable for the second Overcall Album (if any) recorded hereunder of ██████████████████

(b)  In the event that the first MRC Album released hereunder achieves sales in excess of ██████████████ units in the Featured Countries (defined below) through normal retail channels within twelve (12) months of its initial release in the United States (as measured upon the last day of the month during which such 12th month falls including a good faith estimate based on internal information of the number of units sold in such time period), the Recording Fund for the second MRC Album hereunder shall increased by ████████████ ██████████

(c)  In connection with each MRC or Overcall Album hereunder (i.e, recorded in English), in the event that the immediately preceding MRC or Overcall Album hereunder (i.e, recorded in English) (if any) has achieved sales in excess of █████████ ██████████ units in the Featured Countries through normal retail channels within twelve (12) months of its initial release in the United States (as measured upon the last day of the month during which such 12th month falls including a good faith estimate based on internal information of the number of units sold in such time period) (the "12 month period"), the otherwise applicable Recording Fund for such then current MRC or Overcall Album hereunder (i.e, recorded in English) (as may otherwise be increased pursuant to subparagraph 3(b) above) shall be increased by the amount of $1.00 multiplied by the good faith estimate of the number of units of the immediately preceding Album sold in the Featured Countries through normal retail channels within such twelve (12) month period in excess of five million (5,000,000) units up to a maximum of ████████████████████

(d)  The amount of ████████████████████████████ ██████████ of each MRC and Overcall Albums' Recording Fund shall be non-recoupable.

(e)     Intentionally deleted.

(f)     Each Album hereunder shall be recorded on a mutually pre-approved budget basis. In determining whether a budget shall be approved the parties shall consider the budgets of other superstar pop vocalists of Artist's stature and the applicable language such album shall be recorded in. Interscope shall "P.O." the respective Recording Costs in accordance with such pre-approved budget (i.e. issue purchase orders to the respective studios in accordance with the pre-approved budget and thereafter issue payment in accordance therewith). Regardless of your recoupment status Interscope will accept letters of direction for payment in accordance with our then current standard form. All Recording Costs will constitute Advances. Any Recording Costs in excess of the applicable Recording Fund or other amount approved by Interscope, and all Special Packaging Costs, will be your sole responsibility and will be paid by you promptly (or reimbursed by you if paid by us). Those amounts will also be recoupable from all monies, other than those Advances set forth in subparagraphs 3(a),(b), (c), (g) and (j) hereof (and subparagraphs 3(a), (c) and (g) of the Spanish Album Agreement (collectively hereinafter the "Contractual Advances"), becoming payable by us to you under this Agreement and the Spanish Album Agreement (except any Recording Costs in excess of the applicable Recording Fund or other amount approved by Interscope shall not be recoupable from mechanical royalties payable hereunder or under the Spanish Album Agreement). Each Album shall be recorded in accordance with the requirements of all applicable unions, if any. In connection with each MRC Album (excluding the first) and Overcall Album(s) (as applicable), following receipt of your notice of commencement of recording we shall pay to you the amount of ████████████████ ████████████ which shall be deemed a portion of (and thus reduce) the applicable Recording Fund. The balance (if any) of each applicable Recording Fund shall be payable promptly following Delivery of the MRC or Overcall Album concerned.

(g)     We shall make an Advance payment to you in the amount of ████ ███████████████████████████ which amount shall be deemed a pre-██████████████████████████████████████ of the Recording Funds for each of the first MRC Album, the second MRC Album and the first Overcall Album. Notwithstanding the foregoing, if the first Overcall Album is not recorded in English and Delivered hereunder but the second Overcall Album is, then the third payment of Eight Hundred and Thirty Three Thousand Three Hundred and Thirty Three dollars and thirty three cents is a pre-payment of the Recording Fund for the second Overcall Album hereunder. If both Overcall Albums are recorded in Spanish and Delivered under the Spanish Album Agreement, then the third payment of the Eight Hundred Thirty-Three Thousand Three Hundred and Thirty Three Dollars and thirty-three cents payments shall be deemed a pre-payment of the Recording fund for the second Overcall Album under the Spanish Album Agreement . Such amount shall be payable as follows:

(i)     ████████████████████████████████████ ████████ promptly following the execution hereof; and



(ii) ██████████████████████████████ ██████████ on July 1, 1999.

(h)   In addition, we shall make a non-recoupable payment to you in the amount of ██████████████████ payable as follows:

(i) · ██████████████████ promptly following the execution hereof; and

(ii)  ██████████████████ on July 1, 1999.

You hereby request and irrevocably authorize Interscope to pay directly to "Ziffren Brittenham Branca & Fischer", on your behalf, the two ██████████████████ payments referred to in this subparagraph 3(h) (thus the sum of ██████████████████. Such payments shall constitute payments to you.

(i)   Intentionally deleted.

(j)   Greatest Hits:  Interscope may release only one (1) Greatest Hits Album hereunder which may include Master Recordings originally Delivered under the Spanish Album Agreement.  Interscope shall request that you deliver the GH Sides no earlier than immediately following your Delivery of the Album the 3rd consecutive Album including your delivery obligations under both this Agreement and the Spanish Album Agreement and no later than six (6) months after your Delivery of the last Album to be Delivered (i.e., the 6th consecutive Album including your delivery obligations under both this Agreement and the Spanish Album Agreement).  You shall have six (6) months from Interscope's written request to Deliver the GH Sides.  Provided you Deliver the GH Sides, we shall make an "all-in" advance payment to you in the amount of ██████████████████less any unrecouped (as of the quarter ending immediately prior to when Interscope requests such GH Sides) balance in your royalty account with a floor of ████████inclusive of the recording costs incurred in connection with the GH Sides.  If the Greatest Hits Album is released during the Term you shall have the right to approve the release date.  If the Greatest Hits Album is released after the Term Interscope shall have the right to release same during either the first or second Christmas season following the sixth month after the release of the sixth consecutive Album including your delivery obligations under both this Agreement and the Spanish Album Agreement.  Interscope shall coordinate such release with you and any third party record label for which you may be recording albums at that time (i.e., you will have final approval as to which Christmas season same is released).  You and Interscope shall mutually determine the selections to be included on the Greatest Hits Album provided to the extent the parties can not agree on the selections each party shall have the right to select one half of the selections of Master Recordings to be included thereon and further provided you and Interscope hereby approve the inclusion of any Master Recording that attained a top 40 chart position on the chart then reporting "top 100" hits in the United States or attained a top 15 chart position in a similar chart for Spanish speaking recordings in the United States or respective Spanish speaking territories.

23-Jun-99 01:12A

JUN-23-1999  01:05                                                                    P.09

3A.   (a)   Interscope guarantees to pay Artist annual compensation ("Annual Payments") during each of the first seven (7) "Fiscal Years" (as hereinafter defined) which when combined with the amounts paid by Universal under the Spanish Album Agreement equal such amounts as are set forth in sections (1), (2) and (3) below. Artist hereby agrees to accept all such Annual Payments. As used in this paragraph, "Fiscal Year" shall mean each consecutive twelve (12) month period during which (both) this Agreement (and the Spanish Album Agreement are) is in effect, commencing with the date of commencement of the term of this Agreement. At least thirty (30) days before the end of each Fiscal Year, Artist shall notify Interscope in writing if it has not received compensation equal to the Annual Payment for such Fiscal Year and the amount of the deficiency (provided Artist's failure to so notify shall not be deemed a breach hereof), and Interscope will pay Artist the amount of the deficiency.



(1) ▮▮▮▮▮▮▮▮▮▮▮ for the first Fiscal Year of the Agreement;

(2) ▮▮▮▮▮▮▮▮▮▮▮▮ for the second Fiscal Year of the Agreement; and

(3) ▮▮▮▮▮▮▮▮▮ for each of the third through seventh Fiscal Years of the Agreement.

(b)   If in any Fiscal Year the aggregate amount of the compensation (other than Mechanical Royalties) paid to Artist under this Agreement and the Spanish Album Agreement exceeds the Annual Payments due to Artist, such excess compensation shall apply to reduce the Annual Payments due to Artist for any subsequent Fiscal Years. Artist acknowledges and agrees that the Advance payable to Artist pursuant to subparagraph 3(g) (of this Agreement and the Spanish Album Agreement collectively) shall satisfy Interscope's obligation to pay Artist Annual Payments in respect of the first 7 Fiscal Years.

(c)   Each Annual Payment shall be due on or before the last business day of the Fiscal Year to which it applies; provided that if the Agreement expires or terminates prior to the end of a particular Fiscal Year, the applicable Annual Payment shall be reduced proportionately, or shall be such greater amount, if any, as is required pursuant to California Civil Code Section 3423. Any failure by Interscope to make an Annual Payment will not constitute a material breach of the Agreement.

(d)   Interscope shall have the right to pay Artist at any time any additional amounts which may be required to be paid as a condition to Interscope's petitioning for an injunction pursuant to Section 526 of the California Code of Civil Procedure and Section 3423 (5th) of the California Civil Code ("Additional Payments"). Artist hereby agrees to accept any and all such Additional Payments. All compensation (other than Mechanical Royalties) paid to Artist hereunder which is not applied to the Annual Payments theretofore due will be credited toward satisfying the obligation to make Additional Payments as a prerequisite to seeking injunctive relief hereunder. If Interscope actually makes any Additional Payments and

23-Jun-99  01:12A

thereafter elects not to seek such injunction, such Additional Payments shall constitute Advances hereunder.

(e)     Each Annual Payment and Additional Payment, if any, will constitute an Advance and will be applied in reduction of any and all monies (other than Mechanical Royalties) due or becoming due Artist under this Agreement (or the Spanish Album Agreement). Notwithstanding anything to the contrary contained herein, whenever in this Agreement (or the Spanish Album Agreement) Interscope has the right to deduct excess expenditures (including, without limitation, excess Recording Costs, Mechanical Royalties and Special Packaging Costs) from any and all monies otherwise due or becoming due Artist under this Agreement (or the Spanish Album Agreement), Interscope's such right shall not extend to deducting such excess from Mechanical Royalties.

4.     Royalties (inclusive of all third parties, including producers) computed at the applicable percentage, indicated below, of the applicable Royalty Base Price) and payable in accordance with the royalty provisions set forth on Exhibit A:

(a)     Full-priced Albums (payable in respect of ▮▮▮▮▮▮▮▮▮▮▮▮▮ of Net Sales) in the United States, Mexico, Spain, Argentina, Chile, Brazil, Canada: ▮▮▮▮

(b)     Full priced Albums (payable in respect of ▮▮▮▮▮▮▮▮▮▮▮ of Net Sales) in France, Germany, the United Kingdom, Portugal, Venezuela, Columbia, Italy, Holland, Australia and Japan: ▮▮▮▮

(c)     Full-priced Albums (payable in respect of ▮▮▮▮▮▮▮▮▮▮ of Net Sales) in the rest of the world: ▮▮▮▮

5.     Mechanical Royalties:  All Controlled Compositions (i.e., songs written or controlled, directly or indirectly, in whole or in part, by Artist, any affiliated company of Artist, any producer or any affiliated company of any producer) are hereby licensed to Interscope and its distributors/licensees for the U.S. and Canada, respectively, at a rate equal to ▮▮▮▮ of the minimum statutory rate (i. e., without regard to the so-called "long-song formula") which is in effect in the applicable country for the applicable Controlled Composition on the date of release of such Master Recording (but no later than one year after the date such Master Recording was due to be Delivered hereunder) provided the foregoing parenthetical shall not be applicable if the sole cause of the delay in the timely Delivery or release of the applicable Master Recording is due to Interscope's acts or omissions or if Interscope and you mutually agree to delay the release of the applicable Album on which such Master Recording are embodied. The date for determining the applicable mechanical royalty rate for each Master Recording embodied on the Greatest Hits Album shall be the date of initial release of the Greatest Hits Album in the United States and Canada respectively (i.e., not the date of release of each Master Recording as initially released on a respective Album hereunder) and the foregoing "one-year" proviso shall be inapplicable to Greatest Hits Albums. A maximum of 2 times, 4 times, 6 times and 11 (except 12 for compact discs and "Digital Download Records" [as defined in subsection 5.09(a)(iii) of the Exhibit A attached hereto]) times the

Controlled Rate for all songs on each 7" single, 12" single, extended play record and album, respectively. If a Composition is Controlled because it is written or controlled by a producer and not by you and the "long song formula" is applicable, Interscope shall increase the cap commensurately so that portion of the excess mechanicals payable to the producer in connection therewith does not otherwise reduce mechanical royalties payable to you hereunder. Mechanical royalties payable on each record sold through record clubs shall be ▆▆▆ of the above rate. Mechanical Royalties shall be payable on ▆▆▆ of "standard" free goods. Mechanical royalties payable on records distributed through military exchange channels shall be the otherwise applicable mechanical rate. Mechanical royalties on Mid-price records shall be ▆▆▆ of the above rate (except ▆▆▆ in the case of compact discs). Mechanical royalties payable on each budget record and each record sold as a premium shall be ▆▆▆ of the above rate. (The preceding reduction to the mechanical rate will not apply to a Budget Record sold within twenty-four (24) months or to a Mid-price Record sold within eighteen (18) months after the initial release of the Master Recordings concerned on Phonograph Records.)

6.     Individual Producers/Creative Control: The individual producer, selections, recording budget and time and place of recording shall be mutually determined by Interscope and you. You shall have approval over the material terms if Interscope contracts with a third party producer. All recordings hereunder shall be satisfactory in Interscope's sole reasonable judgment, provided satisfactory shall be defined as  (a) it is technically satisfactory to Interscope for Interscope's manufacture and sale of phonograph records; (b) the performance recorded in it is "first class" (as that term is understood in the record industry); and (c) that performance is at least of the quality of Artist's prior recorded performances provided the foregoing is not applicable to the first Album hereunder.

7.     Videos: Interscope shall commit to produce at least two (2) Covered Videos in connection with each album released hereunder provided videos are, at such time, a primary marketing tool in the United States recording industry or we are then producing videos in conjunction with our marketing plans for the majority of our superstar artists of similar stature. With respect to each such Covered Video that Interscope agrees to produce, ▆▆▆ ▆▆▆ of all video production costs (or payments to acquire video rights) paid by Interscope will be recoupable from record royalties and ▆▆▆ thereof will be recoupable from video royalties. You and Interscope shall mutually agree on the production budget for each such video. You and Interscope shall mutually approve the story board, location, director and all other creative elements of each video. The quality of each video produced hereunder shall be commensurate with the quality of videos produced for our other superstar artists. You and Interscope shall mutually approve the selection to be embodied in each video provided any selection embodied as the A-side of any single shall be deemed pre-approved hereunder.

8.     Ownership: All Master Recordings recorded or delivered hereunder during the Term hereof, from inception of recording, and all reproductions derived therefrom, and all videos embodying those recordings and all artwork created for use in connection with those recordings shall be Interscope's property, owned by Interscope from inception and Interscope shall be the copyright proprietor thereof, for the Territory in perpetuity. Artist's services

23-Jun-99 01:12A

hereunder and the proceeds thereof shall be, from inception "works for hire" for purposes of the United States Copyright Act and all other copyright laws through out the Universe. If Interscope shall be deemed not to be the "author" of any of the Master Recordings hereunder, this Agreement shall constitute an irrevocable transfer of ownership of copyright therein. Subject to the terms and conditions of this Agreement, Interscope and its distributors/licensees shall have the right to exploit all such masters in any and all forms of media now known and hereinafter developed and shall have the further exclusive right to use Artist's name, likeness and biographical material (such likeness and biographical material subject to your reasonable and timely approvals) in connection with any and all promotion, marketing and/or exploitation of such masters. No commercial merchandising rights are granted to Interscope herein.

9.    Release Commitment:

(a)    United States within 120 days after Delivery. In the event that we fail to release an Album hereunder in the United States during the applicable 120 day period, we shall have the right to cure within 60 days from our receipt of your notice notifying us of our failure to release. You must notify us within nine (9) months of the end of such 120 day period or you waive such right;

(b)    Canada, Mexico, UK, Italy, France, Germany, Benelux, Spain, Portugal, and each country in Central America and South America where Interscope's distributor has a wholly-owned company within 120 days of initial US release. In the event that we fail to release an Album hereunder in any of the above-mentioned territories during the applicable 120 day period, you shall have the right to notify us within nine (9) months of such 120 day period to cure within 90 days after such notification and if we fail to cure within such 90-day period, our rights to exploit the unreleased albums and all future albums hereunder (excluding the Greatest Hits Album) in such unreleased territory(ies) shall terminate at the end of such cure period. For purposes herein, Interscope's distributor's wholly owned companies in Central America and South America consist of: Argentina, Brazil, Chile, Columbia, Venezuela, Bolivia, Ecuador, Peru, Uruguay and Costa Rica (which company also covers the countries of Guatemala, El Salvador, Nicaragua, Honduras and Panama). The foregoing is subject to change as a company may be bought or sold at any time (i.e., a company in Paraguay is planned to be established in late 1999).

10.    Album Artwork: Artist shall have the right to create all album artwork. The budget for the album artwork shall be mutually approved by Interscope and Artist and such amount shall be commensurate with the applicable budgets for our other superstar artists. Artwork costs incurred within the approved budget shall be non-recoupable. If you do not create the artwork you shall have the right to approve all artwork (subject to actual time constraints), and name and likeness uses. On your written request Interscope shall license the album artwork to you for your use on commercial merchandise on a gratis and quit claim basis subject to all 3rd parties rights and restrictions (if any).

11.    Marketing:    Interscope shall meaningfully consult with you in a good faith, meaningful manner on creating and developing a marketing, advertising and promotion plan

for each Album delivered  hereunder which plan shall be commensurate with our other superstar artists (this sentence shall not be interpreted to require Interscope to increase the video commitment or alter the release commitment made in this Agreement). In connection therewith, Interscope will obtain your approval of the general concept and theme of each national or other major advertising, marketing and promotion campaign in the United States and the major territories (including the major Spanish speaking territories) relating to such Albums (which consent may not be unreasonably withheld) provided that you shall not have the right to frustrate Interscope's ability to release any Album in a timely fashion. Subject to your reasonable availability and Interscope's actual time constraints, you shall have the right to approve the visual elements, concepts, ideas, wording and design of posters, advertisements and other marketing materials which are under Interscope's control in the United States and major territories (including the major Spanish speaking territories), but once you have done so Interscope will not be obligated to obtain your approval of any specific advertisements or other related materials or of any specific placement of advertisements, but such advertisements, related materials, and placements will be consistent with the approved general concept and theme, and will incorporate the pre-approved design. Subject to your arranging same, you may have a representative present at major marketing/promotion meetings in the U.S. and the major territories (including the major Spanish speaking territories) held to discuss the marketing/ promotion of Albums recorded hereunder. Interscope agrees to hire an independent public relations person (on a non-recoupable basis) in conjunction with the release of each album hereunder in the United States which hire and budget shall be mutually approved. Further, we shall arrange for your designated representative to receive BDS and Soundscan information on -line (we shall pay on a non-recoupable basis for the costs of such service, but not your costs of accessing same, i.e., we shall not pay for your costs of going on line or purchasing a computer).   All costs incurred in connection with "Independent Promotion" of records hereunder shall be ▮▮▮recoupable from all royalties (excluding mechanical royalties) hereunder provided in no event shall any amounts in connection with independent promotion in excess of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ per Single ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ be recouped without your consent.  In addition, in connection with each Album released hereunder, subject to your prior professional commitments in connection with promoting the then current Album hereunder, you agree to undertake mutually agreed promotion activities (e.g., appear at radio stations and in-store events) at least 4 (not necessarily consecutive) weeks in Europe (excluding Holland) and 2 (not necessarily consecutive) weeks in the Far East, which promotion activities shall be at Interscope's sole costs on a non-recoupable basis to you unless same is in conjunction with a concert tour in which case only the incremental costs shall be paid by Interscope and shall be on a non-recoupable basis.

     11A.  Marketing Restrictions: Interscope shall not, except as otherwise provided herein:

          (a)     Initially release any Album under any record label other than a top-line label then used by Interscope  in the country concerned for release of performances by Interscope's best selling artists in Artist's genre then under exclusive term contract to Interscope.

(b)     Other than as allowed in subparagraph 11A(d) below, License or otherwise authorize the use of Master Recordings recorded hereunder for use in commercials or for synchronization with feature film, television shows or commercials (other than commercials advertising phonograph records hereunder) or for any other Phonograph Record or non-Phonograph Record use.

(c)     Use, license or otherwise authorize the use of Master Recordings made under this Agreement on "Premium Records".

(d)     Couple (or license for coupling) for commercial exploitation Master Recordings made or furnished hereunder with recordings not embodying Artist's performances, except in each country Interscope shall not need your consent to couple or license for coupling one (1) Master Recording per every one (1) year in connection with one (1) "Now," "Bravo" or similar compilation.

(e)     Sell Albums solely derived from Master Recordings made hereunder in the US as "cut outs" within thirty (30) months after the initial release of the Album concerned.

(f)     Exploit outtakes.

(g)     Select an "A-side" or b- side of a Single in the major territories (including Mexico, Central America and South America) without your prior approval.

(h)     Initially release any Album at a "price point" below "top-line" in the applicable market for that applicable language record.

(i)     License any Album hereunder to a record club.

(j)     Incur any Enhanced Costs hereunder.

(k)     Commercially exploit a Covered Video hereunder.

(l)     Authorize the use of a Record hereunder on a catalog Phonograph Record sold by our special products operations or our Licensees ("SPO's") for sale to educational institutions or libraries, or to other SPO clients for their promotion or sales incentive purposes or on a non-catalog Phonograph Record created on a custom basis for SPO clients.

12.     (a)     You represent, warrant and agree that you have the right to enter into this Agreement and that, subject to paragraph 13 hereinbelow, no Person other than Interscope or Universal (pursuant to the Spanish Album Agreement) will be authorized to use any existing Master Recordings of your Performances for making, promoting, or marketing Phonograph Records and that there are no authorized unreleased recordings by you which may be exploited by third parties during the Term hereof (other than those recordings you recorded

JUN-23-1999  01:08                                                                              P.15

for Fonovisa Records during the term of your prior exclusive artist agreement with them). You represent, warrant and agree that the Master Recordings and all other all other materials, including without limitation, all Controlled Compositions; each name or sobriquet used by you, and all other musical, dramatic, artistic and literary materials, ideas and other intellectual properties furnished or selected by you, or any individual producer and contained in or used in connection with any recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof, shall not infringe upon the rights of any third parties. You warrant and represent that during the Term of this Agreement you will not enter into any agreement which would interfere with the full and prompt performance of your material obligations hereunder and that during the Term hereof, you will not perform or render any services as a recording artist for making Phonograph Records or allow your Performances to appear on Phonograph Records for any Person except Interscope or Universal (pursuant to the Spanish Album Agreement). For the avoidance of doubt, nothing contained herein shall be deemed to restrict Artist from rendering an on camera performance for film , television, pay-per-view, or other audio-visual distribution provided no audio only Phonograph Record or home video device is derived from such performance. Furthermore, nothing in this Agreement shall be deemed to restrict or prevent Artist from establishing and maintaining his own Internet website or rendering performances on a third party Internet website provided that Artist's performances on his or a third party's website shall be limited to (i) not more than one live show cybercast (which shall be "streamed" and not "downloadable") per year (in the aggregate under this Agreement and the Spanish Album Agreement), which show may be re-run one time on a scheduled date (i.e., not on demand); and (ii) not more than once per year up to three (3) "live" performances (which performances may not be live versions of compositions which are or may reasonably be designated as future singles derived from Albums hereunder until Interscope is no longer actively promoting such single) (in the aggregate under this Agreement and the Spanish Album Agreement) may be available on the applicable website for up to thirty (30) days on demand (which shall be "streamed" and not "downloadable"). Each such broadcast shall be of "limited quality" (i.e., less than CD quality). Artist may not use Master Recordings made under this Agreement on such applicable website with out Interscope's prior consent..

(b)      (1)      A "restricted Composition", for the purposes of this subparagraph, is a Composition which shall have been recorded by the Artist for a Master Recording made or Delivered to Interscope under this Agreement.

(2)      Artist will not authorize or knowingly permit his Performance, nor shall Artist render any Performance, of any restricted Composition or any adaptation of a restricted Composition to be recorded for any Person except Interscope for the purpose of making Phonograph Records, at any time before the later of the following dates: (i) the date five (5) years after the date of initial Delivery to Interscope of all the Master Recordings made in the course of the same Album (or other) recording project as the Recording of the restricted Composition concerned, or (ii) the date two (2) years after the expiration or termination of the Term of this Agreement or any subsequent agreement between Interscope and you (or any Person furnishing the your recording services or the results and proceeds thereof) with respect to you recording services.

23-Jun-99 01:12A

JUN-23-1999  01:08                                                                          P.16

(c)    Interscope shall be entitled to seek injunctive and other equitable relief, in addition to whatever legal remedies are available, to prevent or cure any breach or threatened breach of this Agreement. You will at all times indemnify and hold harmless Interscope and any of its Licensees (collectively the "Indemnitee") from and against any and all third party claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach or alleged breach of any warranty or representation made by you in this Agreement or any other act or omission by you, provided the claim concerned has been settled (subject to the provisions of subparagraph 12(d) below) or has resulted in a judgment against any Indemnitee. (For purposes of clarification, the foregoing indemnity is not applicable to any claims brought against Interscope (or its affiliates and licensees) by Fonovisa Records (or its affiliates and licensees) in connection with the Master Recording entitled "Bailamos" as further set forth in paragraph 13 below). Interscope will notify you of any action commenced on such a claim. You may participate in the defense of any such claim through counsel of your selection at your own expense, but Interscope will have the right at all times, in its sole discretion, to retain or resume control of the conduct of the defense. If any claim involving such subject matter has not been resolved, or has been resolved by a judgment or other disposition which is not adverse to any Indemnitee, you will not have any reimbursement obligation to Interscope for any of the expenses actually incurred by Indemnitee in connection with that claim. Pending the resolution of any such claim, Interscope will have the right to withhold monies which would otherwise be payable to you under this Agreement in an amount not exceeding your potential liability to Interscope under this paragraph; provided, however, Interscope will not withhold monies from the Contractual Advances. In addition, Interscope will not withhold other monies which otherwise would be payable to you under this Agreement, if you make satisfactory bonding arrangements in accordance with subparagraph 12(d) below. If no action or other proceeding for recovery on such a claim has been commenced within one (1) year after its assertion, Interscope will not continue to withhold monies in connection with it under this paragraph unless Interscope reasonably believes that a suit may still be commenced.

(d)    If Interscope pays more than ███████ in settlement of any such claim, you will not be obligated to reimburse Interscope for the excess unless you have consented to the settlement, except as provided in the next sentence. If you do not consent to any settlement proposed by Interscope for an amount exceeding ███████ you will nevertheless be required to reimburse Interscope for the full amount paid unless you make bonding arrangements, satisfactory to Interscope in its reasonable discretion, to assure Interscope of reimbursement for all damages, liabilities, costs and expenses (including legal expenses and reasonable counsel fees) which Indemnitee may incur as a result of that claim. If no action or other proceeding for recovery on such a claim has been commenced within one (1) year after its assertion, Interscope will not continue to withhold monies in connection with it under this paragraph.

13.    "Bailamos": As between you and Interscope the recording of the Composition entitled "Bailamos" embodying Artist's Performance shall be deemed a Master Recording recorded hereunder for all purposes. To the best of your knowledge you have not granted to

23-Jun-99 01:12A

Fonovisa any rights in your recording of Bailamos other than as acknowledged hereinbelow. Notwithstanding anything to the contrary contained herein, Interscope acknowledges that Fonovisa Records has made a claim to the ownership of such Master Recording and Interscope (or its affiliates) shall bear (on a non-recoupable basis) all costs incurred by Interscope (or its affiliates) and you (provided we are in control of the litigation) in connection with obtaining a settlement or final judgment as to the ownership of or determination of the respective rights in such recording if we (and/or any of our affiliates) bring suit against Fonovisa to determine same. If both you and Interscope (or any of its affiliates) are sued by Fonovisa in connection with "Bailamos", then subject to Interscope and you mutually determining the choice of litigation firm and the litigation strategy to be employed, Interscope shall defend you and indemnify you, which indemnification shall include Interscope paying all costs in connection therewith (i.e., as opposed to you going out of pocket and us reimbursing you), including the outcome costs (i.e., settlements, judgments, damages) and relevant attorney's fees on a non-recoupable basis provided you shall not have the right to settle such suit without our prior consent. Further, if in connection with Bailamos, you are sued by Fonovisa and we are not, or if both Interscope (or any of its affiliates) and you are sued but the parties' interests are adverse in such suit, subject to Interscope and you mutually determining the choice of litigation firm and the litigation strategy to be employed, your attorney may defend you and we shall indemnify you, which indemnification shall include Interscope paying all costs in connection therewith (i.e., as opposed to you going out of pocket and us reimbursing you) including the outcome costs (i.e., settlements, judgments, damages) and relevant attorney's fees on a non-recoupable basis, provided you shall not have the right to settle such suit without our prior consent. If we (or any of our affiliates) are sued by Fonovisa in connection with "Bailamos" (and you are not), we shall cover all of your costs that may arise directly in connection therewith provided that if an attorney is necessary for you, you shall use the attorney supplied by Interscope. Interscope's use of such recording shall be limited to its being embodied on the Interscope/Overbrook soundtrack album entitled "Wild Wild West" (and as a single derived therefrom) on the terms set forth hereinbelow; on the Greatest Hits Album (subject to the terms of subparagraph 3(j) hereinabove) to be released hereunder; and on the first MRC Album (inclusion of which is hereby deemed approved). Both parties acknowledge, notwithstanding the aforementioned dispute, that such recording was previously released on the album entitled "Cosas Del Amor" outside the United States by Universal Latino pursuant to a distribution contract between Universal Latino and Fonovisa Records, and you shall look to Fonovisa and not to Interscope for payment in connection with such use. In consideration of Interscope/Overbrook's use of "Bailamos" on the soundtrack album entitled "Wild Wild West," as a single derived therefrom, and for possible inclusion in the film (over the second end credits or otherwise), you shall be paid an advance (inclusive of a master use fee but not including a synchronization fee for the use of the Composition) in the amount of ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ against a prorated all-in royalty of ▮▮▮ of SRLP (as otherwise determined, calculated and reduced in accordance with the terms of the Interscope/Overbrook/ Warner Bros. distribution agreement, the redacted terms of which shall be provided to you) which amount (i.e., advance and royalty) shall not be cross-collateralized with the monies paid to you under this Agreement. The foregoing right to include such Master Recording in the film shall include the right of the film company throughout the Universe, in perpetuity, to re-record, reproduce, make copies of, and perform the Master Recording, or excerpts therefrom, in the

soundtrack of and in timed relation with the film, and the exhibition, distribution, performance, presentation, reproduction, telecasting (including free, pay, cable, CATV, satellite and subscription television) and exploitation of the film by or in any method, process, media, manner and form now known or hereafter devised and in any advertisements, trailers, clips, featurettes, or other promotions or co-promotions in connections with the film (collectively "Ads"), and to exploit any of the foregoing in any and all media know known or hereafter devised and by any means or methods now known or hereafter devised.  Interscope may produce two (2) promotional videos for the Bailamos Master Recording.  The first video shall be produced in connection with the film and the costs incurred for the first video shall not be recoupable from royalties payable to you (under this paragraph 13 or otherwise under this Agreement).  The second video shall be deemed a Covered Video for all purposes hereunder except that only ▓▓▓ instead of ▓▓▓ of all such applicable video production costs (or payments to acquire video rights) paid by Interscope will be recoupable from record royalties hereunder.

14.     Remixes: Interscope shall not deduct from any Recording Fund any costs incurred in connection with the remixing of any master To the extent such remix is for radio/promotional use, ~~nor shall~~ such costs be recoupable.  Further, Interscope shall not remix or cause any third party to remix any Master Recording hereunder without your consent.  In addition, Interscope shall not edit, repackage or otherwise alter in any fashion, remaster or resequence (nor instruct nor cause any third party to edit, repackage or otherwise alter in any fashion, remaster or resequence) any Master Recording recorded hereunder.  The preceding sentence will not apply to resequencing for the purpose of equalizing the running time of tracks on phonograph records in non-disc physical configurations.

15.     Interscope shall not exploit any Master Recordings that are not Delivered as part of a completed Album or designated as a Single hereunder and such Master Recording(s) shall only be exploited as part of such Album or Single as Delivered or designated respectively.

16.     Wherever consents and approvals required hereunder, same shall be deemed given within ten (10) business days of our written request therefor.

17.     No music publishing ownership or administration rights are granted to Interscope hereunder.

18.  Intentionally deleted.

19.     THIS AGREEMENT HAS BEEN ENTERED INTO IN THE STATE OF CALIFORNIA, AND THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF CALIFORNIA.  THE CALIFORNIA COURTS (STATE AND FEDERAL), ONLY, WILL HAVE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH INVOLVES SUCH A CONTROVERSY WILL BE BROUGHT IN

THOSE COURTS, IN LOS ANGELES COUNTY, AND NOT ELSEWHERE.   ANY PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY, AMONG OTHER METHODS, BE SERVED UPON YOU BY DELIVERING IT OR MAILING IT, BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS DESIGNATED ON THE FIRST PAGE HEREOF OR SUCH OTHER ADDRESS AS YOU MAY DESIGNATE IN WRITING. ANY SUCH PROCESS MAY, AMONG OTHER METHODS, BE SERVED UPON THE ARTIST OR ANY OTHER PERSON WHO APPROVES, RATIFIES, OR ASSENTS TO THIS AGREEMENT TO INDUCE INTERSCOPE TO ENTER INTO IT, BY DELIVERING THE PROCESS OR MAILING IT BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS DESIGNATED ON THE FIRST PAGE HEREOF OR SUCH OTHER ADDRESS AS THE ARTIST OR THE OTHER PERSON CONCERNED MAY DESIGNATE IN WRITING. ANY SUCH DELIVERY OR MAIL SERVICE SHALL BE DEEMED TO HAVE THE SAME FORCE AND EFFECT AS PERSONAL SERVICE WITHIN THE STATE OF CALIFORNIA.

20.   This Agreement shall be the sole and exclusive binding agreement between the parties setting forth the entire understanding of the parties hereto relating to the subject matter hereof and superseding all prior or contemporaneous agreements, negotiations, promises, representations, understandings and/or discussions whether oral or written, pertaining thereto. No waiver of any of the terms or provisions hereof shall be binding upon either party hereto unless confirmed by a written instrument signed by such waiving party. No modification or amendment of this Agreement or of any of the terms or provisions hereof shall be binding upon either party hereto unless confirmed by a written instrument signed by both parties hereto. No waiver by either party hereto of any term or provision of this Agreement or of any default hereunder shall affect Interscope's or your respective rights thereafter to enforce such term or provision or to exercise any right or remedy in the event of any other default whether or not similar.

**ACCEPTED AND AGREED:**

**Interscope Records**

By:

By:

Enrique Iglesias

EXHIBIT A

**ROYALTIES**

1.01.   Interscope will pay you a royalty computed at the applicable percentage, indicated in subparagraphs 4(a), (b) and (c) of the Agreement to which this Exhibit A is attached (and in subparagraph 1.01(a) below as applicable), of the applicable Royalty Base Price in respect of Net Sales Through Normal Retail Channels of Phonograph Records consisting entirely of Master Recordings recorded under this Agreement during the term and sold by Interscope or its Licensees ("NRC Net Sales").   (Such royalty shall include your royalties and all royalties payable to all other artists, producers, and other Persons (provided such artists, Persons and producers are engaged or approved by you) which become or may become due by reason of the recording and/or exploitation of Master Recordings recorded under this Agreement, other than "per-record royalties" which shall be paid by Interscope).   The royalties payable pursuant to the provisions of paragraphs 1.01, 1.02, 1.03, 1.04, and 1.05 and the provisions of Article 2 below shall apply to all Phonograph Records except Audiovisual Records.   The royalties payable pursuant to the provisions of paragraph 1.06 shall apply solely to Audiovisual Records.

(a) ON SINGLES, TWELVE-INCH SINGLES AND EXTENDED PLAY RECORDS: ████████

1.02.   (a)      The royalty rate on any Record described in section (1) or (3) of this sentence will be ██████████ of the royalty rate that would apply if the Record concerned were sold Through Normal Retail Channels; the royalty rate on any Record described in section (2) of this sentence will be ████ of the royalty rate that would apply if the Record concerned were sold Through Normal Retail Channels and the royalty rate on any Record described in section (4) of this sentence will be ████ of the royalty rate that would apply if the Record concerned were sold Through Normal Retail Channels: (1) any catalog Phonograph Record sold by the special products operations of Interscope or its Licensees ("SPO's") to educational institutions or libraries, or to other SPO clients for their promotion or sales incentive purposes (but not for sale to the general public Through Normal Retail Channels); (2) any Phonograph Record sold outside the United States by Interscope or its Licensees in the country concerned in conjunction with a substantial radio or television advertising campaign during the calendar semi-annual period in which that campaign begins or the next such period provided the aforesaid reduction of the royalty rate will only apply until Interscope recovers ████ of the cost of the campaign from th ████ reduction in royalties; (3) any non-catalog Phonograph Record created on a custom basis for SPO clients (the royalty on any Record described in section (3) will be computed on the basis of the SPO's actual sales price less all taxes and Container Charges); and (4) any Phonograph Records sold by Interscope in the United States through direct mail or phone order or other mail order distribution method (but not direct mail of a physical unit ordered from an Internet site, for which the otherwise applicable royalty shall apply).

JUN-23-1999  01:11                                                              P.21

(b)    In respect of any Master Recording:  (1) leased by Interscope or its Licensees to others for their distribution of Phonograph Records in the United States; (2) embodied on Phonograph Records sold by Interscope's Licensees in the United States through a direct mail or mail order distribution method (including, without limitation, through so-called "record clubs"); or (3) embodied on Phonograph Records sold by Interscope's Licensees in the United States through retail stores in connection with special radio or television advertisements (sometimes referred to as "key-outlet marketing"), Interscope will pay you ███████████ of Interscope's net receipts with respect to such exploitation. ("Net receipts", in the preceding sentence, means Interscope's gross receipts as computed after deduction of all AFM, union and other applicable third party payments actually made or incurred; provided, however, if Interscope's net receipts from such sales are inclusive of manufacturing costs and/or Mechanical Royalties for the applicable Record[s] hereunder, your royalty shall instead be two-thirds (2/3) of the otherwise applicable royalty rate hereunder.)  If another artist, a producer, or any other Person is entitled to royalties on sales of such Records, that payment will be divided among you in the same ratio as that among your respective basic royalty percentage rates.  No royalties shall be payable with respect to Records given away as "bonus" or "free" Records as a result of joining a record club or purchasing a number of Records from a record club or in connection with any introductory, incentive or other offer made by a record club; provided, however, for the purposes hereof, the number of such non-royalty Records shall not exceed ██████████████████████ of the total number of Records distributed through such means.

(c)    (1)    If Interscope or its Distributor sells Records directly (and not through other Licensees) via television and/or radio advertisements in the United States, then such sales for the purposes of subparagraph 1.01(a) hereof shall be deemed USNRC Net Sales and, accordingly, you shall be paid royalties with respect thereto in accordance with subparagraph 1.01(a) hereof, but only with respect to ████████████████ of such Net Sales, less the applicable Container Charge. The ███████ referred to in the preceding sentence is intended to be in lieu of Free Goods other than Special Free Goods.  The total of such non-Special Free Goods and the reduction in Net Sales in this section 1.02.(c)(1) shall not in the aggregate exceed ███████.    (2)    If Interscope sells or licenses third parties to sell Records via telephone, satellite, cable or other direct transmission to the consumer over wire or through the air (e.g. downloading), the royalty rate will be the otherwise applicable royalty rate prescribed in paragraph 1.01.

1.03.    (a)    The royalty rate on any Budget Record will be ████████████████ of the applicable royalty rate prescribed in paragraph 1.01.  The royalty rate on any or any Premium Record will be ████████████████ of the applicable royalty rate prescribed in paragraph 1.01.  The royalty rate on any Mid-price Record or any Record sold for distribution through military exchange channels will be ████████████████ of the applicable royalty rate prescribed in paragraph 1.01.  (The preceding reduction will not apply to a Budget Record sold within twenty-four (24) months, or to a Mid-price Record sold within eighteen (18) months, after the initial release of the Master Recordings concerned on Phonograph Records.)  The royalty on any Premium Record or Record sold for distribution

23-Jun-99 01:12A

through military exchange channels will be computed on the basis of the actual sales price (or Post Exchange list price where applicable) less all taxes and Container Charges.

(b)    (1)    The royalty on any compact disc Record will be a royalty computed at ████████████████ of the rate which would otherwise apply under this Agreement.

(2)    The royalty on any New Medium Record (excluding digital downloads for which a royalty computed at ████████████ of the otherwise applicable rate under this Agreement shall apply) will be a ████ of the rate which would otherwise apply under this Agreement during a two (2) year "introductory period", the future rate to be negotiated in good faith, but in no event shall such rate exceed ████ of the otherwise applicable royalty rate provided if during any accounting period, sales of a particular New Medium configuration account for more than thirty-three and one-third ████████ percent of the market share of phonograph records sold in all configurations during that accounting period, the royalty rate for prospective sales of Records in such New Medium configuration, commencing on the first day of the following semi-annual accounting period, shall be ████████████████ of the rate which would otherwise apply under this Agreement.

(c)    The royalty rate on a Multiple Record Set will be the otherwise applicable royalty rate multiplied by a fraction (which shall in no event be larger than one (1)), the numerator of which is the SRLP of such Multiple Record Set in the applicable configuration in the territory where the Multiple Record Set is sold and the denominator of which is Interscope's then-prevailing SRLP for Interscope's newly-released Top-line Albums in such configuration in the applicable territory multiplied by the number of Records contained in such Multiple Record Set.

1.04.    In respect of Phonograph Records derived from Master Recordings furnished by Interscope or its Licensees to others for their manufacture and distribution of Records outside the United States, Interscope will pay you ███████████████████ of the net receipts derived from those transactions by Interscope after deduction from Interscope's gross receipts of all Mechanical Royalties, AFM, union and all other applicable third party payments (which payments will be apportioned as provided in paragraph 1.02 if another artist, a producer, or any other Person is entitled to royalties in respect of such Records).

1.05.    If Interscope authorizes the use of any Master Recording made under this Agreement on a flat fee basis, royalty rate or cent rate basis for any type of use not specifically covered elsewhere in this Article 1, (such as, but not limited to, use in a commercial or motion picture other than a Covered Video), it will credit your royalty account with an amount equal to fifty percent (50%) of its net receipts attributable directly to that use. "Net receipts", in the preceding sentence, means Interscope's gross receipts as computed after deduction of all payments required to be made by Interscope to others in connection with those uses (for example, re-use payments under Interscope's agreements with the American Federation of Musicians). If another recording artist, a producer, or any

other Person is entitled to royalties on such uses, the amount to be credited under this paragraph will be apportioned in the same ratio as that among your respective basic royalty percentages. If any item of such receipts is attributable to Master Recordings made under this Agreement and other Master Recordings, the amount of that item includible in gross receipts under this paragraph will be computed by apportionment on the basis of the number of Master Recordings involved.

1.06.   Interscope will pay you royalties in connection with commercial uses of Audiovisual Records (including for sales of Audiovisual Records which contain Covered Videos) on terms to be negotiated in good faith at the time the parties mutually agree to produce same.

## 2.   MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding anything to the contrary contained in paragraph 4 of the Agreement to which this Exhibit A is attached or Article 1 hereof:

2.01.   In respect of Joint Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the total number of royalty artists whose Performances are embodied on a Joint Recording.

2.02.   The royalty rate on a Phonograph Record embodying Master Recordings made hereunder together with other Master Recordings will be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of Sides embodying Master Recordings made hereunder and the denominator of which is the total number of royalty-bearing Sides contained on such Record.

2.03.   Except as otherwise provided in paragraph 2.04, no royalties will be due or payable in respect of Phonograph Records:  (a) sold (for less than ███ f Interscope's posted wholesale price), distributed or furnished on a no-charge basis by Interscope or its Licensees for promotional purposes (including, without limitation, Records to disc jockeys, publishers, motion picture companies, television and radio stations, and other customary recipients of promotional Records) or to Interscope's or its Licensees' employees and relatives; (b) sold, distributed or furnished on a no-charge basis to members, applicants or other participants in any "record club" or other direct mail distribution method (subject to subparagraph 1.02(b) above); (c) sold at close-out prices or as surplus, overstock or scrap; (d) sold as cutouts after the listing of such Records has been deleted from the catalog of Interscope or its Licensees; (e) given away or shipped as "free", "no charge" or "bonus" Records (whether or not intended for resale); and (f) sold at a discount from the Record's posted wholesale list price (but for more than ███ of such price), whether or not intended for resale.  In determining the number of Records as to which no royalties are payable pursuant to subparagraph (f) above, Interscope shall multiply the percentage amount of such discount by the number of Records sold at such discount.  No royalties will be payable

to you on Records containing Recordings of not more than two (2) Master Recordings made hereunder sold as "samplers" at a price which is ▮▮▮▮▮▮▮▮▮▮ or less of the SRLP of Interscope's then current newly-released Top-line Records, on Records intended for free distribution as "samplers" to automobile or audio and/or audiovisual equipment purchasers (whether or not postage, handling, or similar charges are made), or distributed for use on transportation carriers.

2.04.   Those Records distributed pursuant to subparagraphs 2.03(e) and (f) are herein referred to as "Free Goods". Interscope shall have the right to distribute Free Goods for Albums in the United States not in excess of ▮▮▮▮▮▮▮▮▮▮ of the aggregate units of all Top-line Albums distributed under this Agreement. In addition, from time to time, Interscope or its Distributor, jointly or separately, shall have the right to conduct special sales programs of limited duration which include the distribution of Free Goods in excess of the limitation set forth in the preceding sentence ("Special Free Goods"), but not in the United States in excess of ▮▮▮▮▮▮▮▮▮▮ of the aggregate units of all Albums distributed under this Agreement. Outside the United States the Free Goods limits shall be in accordance with the current levels (as may vary from time to time) applied by our affiliates in the applicable countries (a list of the current levels are set out in Schedule A attached hereto). The limits set forth on the attached Exhibit A include both standard and Special Free Goods.   If Interscope distributes Free Goods in excess of the foregoing limitations, Interscope will not be in breach hereof, but Interscope will pay you your normal royalty on such excess.

2.05.   If legislation requiring the payment of copyright royalties for the public performance of Phonograph Records is enacted in the United States and Interscope receives such royalties with respect to Master Recordings produced under this Agreement, and you do not receive or waive any similar payment from anyone other than Interscope, then Interscope will credit your royalty account with that portion of such royalties as required (e.g., by law, applicable collective bargaining agreement, etc.), less any portion thereof which is payable by Interscope to producers or any other Person; provided, that if you receive payment in respect thereof from any other Person, then Interscope shall credit your royalty account with such amount as shall provide you with a total (including the share received by you from any other Person) equal to ▮▮▮▮▮▮▮▮▮▮ of the aggregate amount paid to Interscope, less any portion thereof which is payable by Interscope to any producers or any other Person.   Outside of the United States, if we receive payment of public performance royalties that are otherwise payable to you, we shall remit same to you.

3.   **ROYALTY ACCOUNTINGS**

3.01.   Interscope will compute your royalties as of each June 30th and December 31st (or such other semi-annual periods as Interscope may elect in its sole discretion) for the prior six (6) months, in respect of each such six-month period in which there are sales or returns of Records or any other transactions on which royalties are payable to you, or liquidations of reserves established previously.   Within three (3) months following the end of each such semi-annual period, Interscope will send you a statement covering those

royalties and will pay you any royalties which are due after deducting unrecouped Advances and chargeable costs under this Agreement and such amount, if any, which Interscope may be required to withhold pursuant to the California Revenue and Taxation Code, the U.S. Tax Regulations (as of the date hereof it is our opinion that such codes and regulations do not require Interscope to withhold; this current interpretation shall not be binding on Interscope in the future) or any other applicable statute, regulations, treaty or law. Royalties payable for any semi-annual accounting period will not be charged with Advances paid under paragraph 3 of the Agreement to which this Exhibit is annexed after the end of the accounting period for an MRC or Overcall Album Delivered within the time prescribed in subparagraph 2(d) of the Agreement to which this Exhibit is annexed after the expiration of the semi-annual accounting period for which such statement is rendered. After the term, no royalty statements shall be required for periods during which no additional royalties accrue unless you give Interscope a written request therefor before the expiration of the semi-annual accounting period to which the desired royalty statement relates. In computing the number of Records sold, only Records for which Interscope has been paid shall be deemed sold, and Interscope shall have the right to deduct returns and credits of any nature and to withhold reasonable reserves therefor (but with respect to Albums in no event more than ▆▆▆ of units shipped) from payments otherwise due you. Each royalty reserve against anticipated returns and credits will be liquidated not later than the end of the fourth semi-annual accounting period following the accounting period during which it is established. If Interscope makes any overpayment to you, you will reimburse Interscope for it; Interscope also may deduct it from any payments due or becoming due to you. If Interscope pays you any royalties on Records which are returned later, those royalties will be considered overpayments. Interscope may at any time elect to utilize a different method of computing royalties so long as such method does not decrease the net monies received by or credited to you hereunder.

3.02.   Sales of Records for distribution outside the United States are called "foreign sales". Interscope will compute your royalties for any foreign sale in the same national currency in which Interscope's Licensee pays Interscope for that sale, and Interscope will credit those royalties to your account at the same rate of exchange at which the Licensee pays Interscope. For purposes of accounting to you, Interscope will treat any foreign sale as a sale made during the same six-month period in which Interscope receives its Licensee's accounting and payment for that sale. (For the purposes of this paragraph, any royalties credited by a Licensee to Interscope's account but charged in recoupment of a prior advance made to Interscope and retained by the Licensee by reason of that charge will be deemed paid to Interscope and received by it when it receives the Licensee's accounting reflecting the credit and charge concerned.) If any Interscope Licensee deducts any taxes from its payments to Interscope, Interscope may deduct a proportionate amount of those taxes from your royalties. If, after a final audit of its tax returns by the Internal Revenue Service, Interscope is allowed a credit against its U.S. income taxes for all or a portion of any taxes withheld by an Interscope Licensee from its royalty remittances to Interscope which were deducted from your royalties, the amount of such tax credit attributable to your royalties will be credited to your account. The amount of the tax credit to be credited to your account will be determined by Interscope; such determination will be conclusive and

you will not be entitled to examine Interscope's tax returns or any portion of them.  If any law, any government ruling, or any other restriction affects the amount of the payments which an Interscope Licensee can remit to Interscope, Interscope may deduct from your royalties an amount proportionate to the reduction in the Licensee's remittances to Interscope.  If Interscope cannot collect payment for a foreign sale in the United States in U.S. Dollars it will not be required to account to you for that sale, except as provided in the next sentence.  Interscope will, at your request and at your expense, deduct from the monies so blocked and deposit in a foreign depository the equivalent in local currency of the royalties which would be payable to you on the foreign sales concerned, to the extent such monies are available for that purpose, and only to the extent to which your royalty account is then in a fully recouped position. All such deposits will constitute royalty payments to you for accounting purposes.

3.03.  Interscope will maintain books and records which report the sales or other exploitations of Phonograph Records and Master Recordings hereunder on which royalties are payable to you.  You may, at your own expense, designate a certified public accountant ("CPA") to examine those books and records, as provided in this paragraph only.  Such examination: (a) may be made only for the purpose of verifying the accuracy of the statements sent to you under paragraph 3.01; (b) may be made for a particular statement only once and only within three (3) years after the date when Interscope sends you that statement; and (c) may be made only during Interscope's usual business hours, and at the place where it keeps the books and records to be examined, and upon reasonable notice to Interscope. (Interscope will be deemed conclusively to have sent you each statement on the date prescribed in paragraph 3.01 unless you notify Interscope otherwise, with respect to any statement, within ninety (90) days after that date.)  No examination may be made of any manufacturing records or any other records that do not specifically report sales or other distributions of Phonograph Records or other transactions on which royalties are payable to you.  Further, such examination shall be conditioned upon the CPA's written agreement to Interscope that the CPA will not voluntarily disclose any findings to any Person other than you, your attorney or other advisers.

3.04.  If you have any objections to a royalty statement, you will give Interscope specific notice of that objection and your reasons for it within three (3) years after the date that Interscope is deemed to have sent you that statement under paragraph 3.03.  Each royalty statement will become conclusively binding on you at the end of that three-year period, and you will no longer have any right to make any other objections to it.  You will not have the right to sue Interscope in connection with any royalty accounting, or to sue Interscope for royalties on Records sold or receipts derived by Interscope during the period a royalty accounting covers, unless you commence the suit within six (6) months after the end of that three-year period.   If you commence suit on any controversy or claim concerning royalty accountings rendered to you under this Agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing.  Your recovery of any such royalties will be the sole remedy available to you by reason of any claim related to

Interscope's royalty accountings.  Without limiting the generality of the preceding sentence, you will not have any right to seek termination of this Agreement or avoid the performance of your obligations under it by reason of any such claim.  The preceding three sentences will not apply to any item in a royalty accounting if you establish that the item was fraudulently misstated.

## 4.   LICENSES FOR MUSICAL COMPOSITIONS

4.01.   (a)   (1)   You grant to Interscope and its Licensees and their designees an irrevocable license, under copyright, to reproduce each Controlled Composition on Phonograph Records of Master Recordings made under this Agreement, other than Audiovisual Records, and to distribute them in the United States and Canada.

(2)   For that license, Interscope will pay Mechanical Royalties, on the basis of Net Sales, at the rates set forth in paragraph 5 of the Agreement to which this Exhibit is attached.  If the Composition is an arranged version of a public domain work, the Mechanical Royalty on it will be  of the amount fixed in subsection (i) or (ii) above, unless a different rate applies under section 4.01(a)(4) below.  No Mechanical Royalties will be payable for any Records described in paragraph 2.03.  Notwithstanding the preceding sentence, Interscope shall pay Mechanical Royalties pursuant to this subparagraph 4.01(a) with respect to Controlled Compositions embodied on Albums hereunder on  of those units of such Albums distributed in the United States as Standard Free Goods, but Interscope shall not be obligated to pay Mechanical Royalties on any such Albums distributed as Special Free Goods.

(3)   If a Person not in any of the categories referred to in paragraph 5.12 holds a joint ownership interest ("Independent Interest") in a Controlled Composition, Interscope will have the right, at its election, to pay or credit directly to that Person a share of the Mechanical Royalty payable with respect to that Composition under subsection 4.01(a)(2)(i), proportionate to the amount of the Independent Interest, and increased proportionately on the basis of the full amount of the minimum statutory rate applicable (for example, ▇▇ if the Independent Interest is a ▇▇▇▇▇ ownership interest and the applicable minimum statutory rate is ▇▇ .  The amount of the proportionate increase of each such payment or credit will constitute an Advance and will be recoupable from all monies becoming payable by Interscope to you hereunder.

(4)   If ASCAP or BMI accords regular performance credit for any Controlled Composition which is an arranged version of a public domain work, the Mechanical Royalty rate on that Composition will be apportioned according to the same ratio used by ASCAP or BMI in determining the performance credit.  Interscope will not be required to pay you at that rate unless you furnish it with satisfactory evidence of that ratio.

(b)   (1)   The total Mechanical Royalty for all Compositions on any Album, including Controlled Compositions, will be as set forth in paragraph 5 of the Agreement.

(2)     The maximum Mechanical Royalty under this subparagraph (b) on a Multiple Record Set will be the same amount prescribed in section 4.01(b)(l), multiplied by a fraction, the numerator of which is the SRLP of such Multiple Record Set in the applicable configuration in the United States and the denominator of which is Interscope's then-prevailing SRLP for Interscope's newly-released Top-line Albums in such configuration in the United States.

(c)     Interscope will compute Mechanical Royalties on Controlled Compositions as of each February 28th (or 29th, if applicable), May 31st, August 31st and November 30th (or such other quarter-annual periods as Interscope may elect in its sole discretion) for the prior three (3) months, in respect of each quarter-annual period in which there are sales or returns of Records on which Mechanical Royalties are payable to you, or liquidations of Mechanical Royalty reserves established previously.  On the 15th day of the second month following the end of each such quarter-annual period, Interscope will send a statement covering those Mechanical Royalties, less a reasonable reserve against anticipated returns and credits, and will pay any net Mechanical Royalties which are due. Mechanical Royalty reserves maintained by Interscope against anticipated returns and credits will not be held for an unreasonable period of time; retention of a reserve for two (2) years after it is established will not be considered unreasonable in any case.  If Interscope makes any overpayment of Mechanical Royalties to you you will reimburse Interscope for it; Interscope may also recoup it from any payments due or becoming due to you hereunder. If Interscope pays any Mechanical Royalties on Records which are returned later, those Mechanical Royalties will be considered overpayments.   If the total amount of the Mechanical Royalties which Interscope pays on any Record consisting of Master Recordings made under this Agreement (including Mechanical Royalties for Compositions which are not Controlled Compositions) is higher than the limit fixed for that Record under subparagraph 4.01(b), that excess amount will be considered an overpayment also. Paragraphs 3.03 and 3.04 will apply to Mechanical Royalty accountings.

4.02.   You also grant to Interscope and its Licensees and their designees an irrevocable license under copyright to reproduce each Controlled Composition in Covered Videos and Audiovisual Records, to reproduce those Covered Videos and Audiovisual Records, distribute them, and perform them in any manner (including, without limitation, publicly and for profit), to manufacture and distribute Audiovisual Records and other copies of them, and to exploit them otherwise, by any method and in any form known now or in the future, throughout the world, and to authorize others to do so.  Interscope will not be required to make any payment in connection with those uses, and that license will apply whether or not Interscope receives any payment in connection with any use of any Covered Video or Audiovisual Record.  If any exhibition of a Covered Video or Audiovisual Record is also authorized under another license (such as a public performance license granted by ASCAP or BMI), that exhibition will be deemed authorized by that license instead of this Agreement.  (In all events, Interscope and its Licensees will have no liability by reason of any such exhibition.)

JUN-23-1999 01:16 P.07/33

4.03. (a) If any Recordings made under this Agreement contain copyrighted Compositions which are not Controlled Compositions, you will use reasonable efforts to obtain licenses covering those Compositions for Interscope's benefit on the same terms as those which apply to Controlled Compositions under this Article 4. In all events, you will guarantee the availability of licenses covering them for the United States providing for royalties at the statutory rate applicable to the use of Compositions on phonorecords under the compulsory license provisions of the United States copyright law, and licenses for them for Canada providing for royalties at the rates then prevailing in Canada on a general basis with respect to the use of Compositions on Standard Records and subparagraph 4.01(b) will continue to apply.

(b) You will cause the issuance of effective licenses, under copyright and otherwise, to reproduce each Controlled Composition on Phonograph Records and distribute those Records outside the United States and Canada, on terms not less favorable to Interscope or its Licensees than the terms prevailing on a general basis in the country concerned with respect to the use of Compositions on comparable Records.

4.04. You warrant and represent that the "Schedule of Publishers" appended to this Agreement is a complete list of the music publishers in which you have a direct or indirect interest. You will notify Interscope promptly of each additional music publisher in which you acquire any such interest and of every other change required to keep the list currently accurate.

4.05. Neither you, nor any Person deriving rights from you, will authorize the use of any Controlled Composition in a radio or television commercial or any other advertising or promotional matter, unless you first require the Person authorized to make the use concerned to agree in writing, for Interscope's benefit, that the use will not involve a "sound-alike" Recording resembling a Performance of that Composition by you. (A "sound-alike" Recording is a different Recording which imitates or simulates the Recording concerned by using a substantially similar musical arrangement or otherwise.)

4.06. Subject to the provisions of section 4.01(a)(3) above, if the copyright in any Controlled Compositions is owned or controlled by a Person other than you, you shall cause that Person to grant Interscope and its Licensees and their designees the same rights as you are required to grant to Interscope and its Licensees pursuant to this Article 3. Any assignment, license or other agreement made with respect to any Controlled Composition shall be subject to the terms hereof.

4.07. You also grant to Interscope and its Licensees and their designees an irrevocable license under copyright to print and reproduce, at their election, the title and lyrics to any Controlled Composition on Album Artwork and in connection with Covered Videos or Audiovisual Records, and the packaging therefor, throughout the world in perpetuity, without payment to you or any other Person of any monies or other consideration in connection therewith.

23-Jun-99 01:37A

P. 08/33
JUN-23-1999   01:16

5.    **DEFINITIONS**

5.01.   "Master Recording" and "Recording" - every recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Phonograph Records.

5.02.   "Inception of Recording" - the first recording of Performances or other sounds with a view to the eventual fixation of a Master Recording.   "Master Recordings from the Inception of Recording" include, without limitation, all rehearsal recordings, "outtakes", and other preliminary or alternate versions of sound recordings which are created during the production of Master Recordings made under this Agreement.

5.03.   "Performance" (whether audio only or audiovisual) - means singing, speaking, conducting or playing an instrument, alone or with others.

5.04.   "Person" - any natural person, legal entity, or other organized group of persons or entities, or legal successors or representatives of the foregoing.   (All pronouns, whether personal or impersonal, which refer to Persons include natural persons and other Persons.)

5.05.   (a)   "Records" and "Phonograph Records" - all forms of reproductions (including, sound alone and audiovisual reproductions), now or hereafter known, manufactured or distributed primarily for home use, institutional use (e.g., library or school), juke box use, or use in means of transportation (including, without limitation, video games and any software media or transmission of such reproductions via telephone, cable, satellite or other transmissions to consumers directly into the home).

(b)   "Audiovisual Record" - a Phonograph Record including sound accompanied by visual images intended primarily for home consumer or institutional (e.g., library or school) use, jukebox use or use in means of transportation, including, without limitation, videocassettes, laser discs, videodiscs or other media or devices now or hereafter known that, among other things, allow consumers to control the viewing of, or to interact with, the Audiovisual Record, including, without limitation, transmissions to consumers directly into the home that enable consumers to view such Records at any time. Audiovisual Records are not Albums, Singles, Twelve-Inch Singles, or Extended Play Records.

5.06.   "Royalty Base Price" - The Royalty Base Price for Records (other than Audiovisual Records) shall be the Suggested Retail List Price applicable to the Phonograph Records concerned, less all excise, purchase, value added or similar taxes included in the price and less the applicable Container Charge. The Royalty Base Price for Records (other than Audiovisual Records) sold through any so-called "record club" will be the same as that for the identical Records sold Through Normal Retail Channels in the territory concerned. The Royalty Base Price for Audiovisual Records manufactured and distributed by

23-Jun-99  01:37A

Interscope or its Licensees shall be Interscope's or its Licensee's published wholesale price as of the commencement of the accounting period concerned, less all excise, purchase value added or similar taxes included in the price and less the applicable Container Charge.

5.07.   "Container Charges" - the applicable percentage, specified below, of the Suggested Retail List Price applicable to the Records concerned:



(a)   Audiovisual Records

(b)   Compact disc Records/New Medium Records -



(c)   Other Records ███████████████ on analog vinyl-disc Records in single-fold packaging; ███████ on analog vinyl-disc Records in double-fold packaging and ███████ on analog Records in non-vinyl disc configurations.

Container Charges will not be deducted for Singles packaged only in stock paper sleeves.

5.08.   "Net Sales" - ████ of gross sales, less returns, credits and reserves against anticipated returns and credits.  Returns will be apportioned between records sold and "free goods" in the same ratio in which Interscope's customer's account is credited.

5.09.   "Suggested Retail List Price" or "SRLP":

(a)   "Suggested Retail List Price" or "SRLP":

(i)   With respect to Records sold for distribution in the United States:

(aa)   Other than with respect to Compact Discs, Digital Compact Cassettes, Mini-Discs, other digital configurations, and any and all new technologies: Interscope's published suggested retail list price in the United States during the applicable accounting period for the computation of royalties to be made hereunder, it being understood that a separate calculation of the suggested retail list price will be made for each price configuration of Records manufactured and sold by Interscope.

(bb)   With respect to Compact Discs, Digital Compact Cassettes, Mini-Discs, other digital configurations, and any and all new technologies: ████████ ████████████████████ f Interscope's lowest published wholesale price in the category of sale concerned.  In the event such wholesale price changes during an accounting period, the applicable wholesale price for the entire accounting period will be deemed to be the average lowest daily wholesale price during the period  Notwithstanding anything to the contrary expressed or implied herein, the wholesale price utilized hereunder for royalty purposes shall not reflect a discount in respect of the cost of any "free goods"

JUN-23-1999  01:17                                                                          P.10/33

(solely as defined herein). For example: as of the date hereof, on the price sheet given by Interscope's Distributor to retailers the price listed for the price category of the majority of our newly released compact disc Records lists a price  As this price is net of Standard Free Goods, the wholesale price for the purpose of this subsection (i.e., calculating royalties payable hereunder) would be ▓▓▓ divided by ▓▓▓ or ▓▓▓. It is this figure ▓▓▓▓▓▓▓ that would be multiplied by ▓▓▓▓▓▓▓

(ii)    With respect to Records sold for distribution outside the United States: the retail equivalent price utilized by Interscope's licensee in computing monies to be paid to Interscope for the Record concerned, provided that in any country where there is no actual suggested or applicable retail list price, the SRLP will be deemed to be the price established by Interscope or its licensee(s) in conformity with the general practice of the recording industry in such country, provided if a retail-related price can not be established in a particular country, the price shall be that amount equal to the published price to dealers payable by the largest category of Interscope customers in the normal course of business with respect to Records sold for distribution during the applicable semi-annual accounting period, multiplied by ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ In the event such general practice or similar base price includes an adjustment for either container deductions, free goods, or taxes, such adjustments will be excluded therefrom, but this will not prevent us from deducting the container deductions, free goods, or taxes otherwise specifically permitted to be deducted elsewhere in this exhibit to the Agreement.

(iii)    Notwithstanding anything to the contrary herein, the Suggested Retail List Price with respect to Records sold by Interscope directly to a consumer through direct response, or through transmission via telephone, cable, satellite or other transmissions to consumers over wire or air directly into the home will be Interscope's actual sales price of such Records (but in the US, ▓▓▓ of the such actual sales price). The ▓▓▓ referred to in the preceding parenthetical is intended to be in lieu of Free Goods other than Special Free Goods. The total of such non-Special Free Goods and the reduction in the preceding parenthetical shall not in the aggregate exceed ▓▓▓ Notwithstanding the foregoing, after the first two (2) years from the date hereof, at the written request of either you or Interscope (not to be given more than once during the term hereof) Interscope agrees to negotiate with you in good faith concerning the calculation of royalties payable to you hereunder with respect to Records sold by Interscope directly to a consumer through transmission via telephone, cable, satellite or other transmissions to consumers over wire or air directly into the home (sometimes referred to herein as "Digital Download Records"), taking into consideration the manner in which Interscope is then calculating royalties for artists signed after the date hereof or whose contracts have been renegotiated after the date hereof and in either event whose contract provide a base royalty rate of ▓▓▓ of SRLP or higher. No failure by the parties to reach an agreement after such good faith negotiation shall constitute a breach of this Agreement, nor shall such failure result in the loss of or otherwise affect any of Interscope's rights under this Agreement.

23-Jun-99  01:37A

JUN-23-1999  01:17

(c)     Interscope or its Licensees may at some time change the method by which it computes royalties in the United States from a retail basis to some other basis (the "New Basis"), such as, without limitation, a wholesale basis. The New Basis will replace the then-current Suggested Retail List Price and the royalty rates shall be adjusted to the appropriate royalty which would be applied to the New Basis so that the dollars and cents royalty amounts payable with respect to the Record concerned would be the same as that which was payable immediately prior to such New Basis. If a Record was not theretofore sold in a particular configuration or in a particular price-series (e.g., a Budget Record), the adjusted royalty rate for any such configuration shall be the adjusted royalty rate on Top-line Records multiplied by a fraction, the numerator of which is the royalty rate for sales in the configuration (or price-series) concerned prior to the New Basis and the denominator of which is the royalty rate for sales of Top-line Records in the applicable configuration prior to the New Basis. If there are other adjustments made by Interscope or its Licensees that would otherwise make the New Basis more favorable (a particular example of which might be the distribution of smaller quantities of free goods than theretofore distributed) then the benefits of such other adjustments will be taken into consideration in adjusting the royalty rate.

(d)     Royalties will be calculated separately with respect to each price series in which units of a particular Record release are sold or returned during the semi-annual accounting period concerned. References to published prices in this section refer to those in effect at the commencement of the accounting period concerned.

5.10.   (a)     "Advance" - a prepayment of royalties. Interscope may recoup Advances from royalties to be paid to or on your behalf pursuant to this Agreement and the Spanish Album Agreement. Advances paid under paragraph 3 of the Agreement to which this exhibit is annexed will not be returnable ~~subject to the 7th and 8th sentences of subparagraph 12(c) of the Agreement to which this exhibit is annexed and provided the foregoing shall not operate to affect your indemnification obligations~~.

(b)   (1)     ███████████████ of the production and acquisition costs incurred in connection with any Covered Video will be recoupable from your royalties on sales of Records which do not reproduce visual images ("audio royalties") under subparagraph 5.02(a), and ███████████████ of such costs will be recoupable from monies otherwise payable to you from the exploitation of such Covered Videos pursuant to paragraph 1.06 above. If any such costs are recouped from audio royalties and additional royalties accrue under paragraph 1.06 subsequently, the latter royalties will be applied in recoupment of those costs and the amount of those audio royalties which were previously applied against those costs will be credited back to your account.

(2)     All costs incurred in connection with creating the so-called "enhanced" or multimedia portion (including without limitation, videos, photography, graphics, technology, etc.) of an enhanced CD, CD +, CD Rom, DVD or any other similar configuration (whether now known or hereafter created embodying Masters hereunder (the

Enrique Exhibit A English                    14                    6/22/99

23-Jun-99 01:37A

JUN-23-1999  01:18                                                              P.12/33

"Enhanced Costs") will be recoupable from monies (excluding mechanical royalties) otherwise payable to you hereunder.

5.11.  "Composition" - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.  Recordings of more than one (1) arrangement or version of the same Composition, reproduced on the same Record, will be considered, collectively, a recording of one (1) Composition for all purposes under this Agreement.

5.12.  "Controlled Composition" - a Composition wholly or partly written, owned or controlled by you, a producer, or any Person in which you, or a producer has a direct or indirect interest.

5.13.  (a)    "Album" -a sufficient number of Masters embodying Artist's Performances to comprise one (1) or more compact disc Records, or the equivalent, of not less than thirty-six (36) (but for Spanish Albums thirty-two (32) minutes provided same contains six Sides of not less than 3 minutes each) minutes of playing time and containing at least ten (10) different Compositions.

(b)    "Single" - a vinyl-disc Record not more than seven (7") inches in diameter, or the equivalent in a non-vinyl-disc configuration, which contains Recordings of not more than two (2) Compositions.

(c)    "Twelve-Inch Single" - a twelve-inch (12") vinyl-disc Record, or the equivalent in a non-vinyl-disc configuration, which contains Recordings of not more than three (3) Compositions and does not constitute an Album.

(d)    "Extended Play Record" - a Record which contains Recordings of four (4) or more Compositions but does not constitute an Album.

5.14.  "Side" - a Master Recording of a continuous Performance of a particular arrangement or version of a Composition, not less than two and one-quarter (2-1/4) minutes in playing time.   If any Album (or other group of Master Recordings) Delivered to Interscope in fulfillment of a Recording Commitment expressed as a number of Sides includes Master Recordings of more than one (1) arrangement or version of any Composition, all of those Recordings will be deemed to constitute one (1) Side.

5.15.  "Joint Recording" - any Master Recording embodying your Performance and any Performance by another artist with respect to which Interscope is obligated to pay royalties.

5.16.  "Sales Through Normal Retail Channels" - Net Sales other than as described in paragraphs 1.02, 1.03(a), 1.04, 1.05, 1.06, 2.03 and 2.04.   Sales via "digital downloading" and sales by Interscope in the United States through direct mail or phone

23-Jun-99  01:37A

JUN-23-1999  01:18                                                                              P.13/33

order or other mail order distribution solely of a physical unit ordered from an Internet site are deemed included herein.

5.17.  (a)  "Licensees" - all Persons (whether or not affiliated with Interscope or Interscope's Distributor) to which Interscope has licensed the right of sale, distribution or exploitation of Master Recordings and/or Records made hereunder, including, without limitation, wholly or partly owned subsidiaries, affiliates, and other divisions of Interscope or its Distributor.

(b)  "Distributor" - the record company having the exclusive right at any time to distribute Interscope's newly released Records through USNRC.

5.18.  "Delivery", when used with respect to Master Recordings - means the actual receipt and acceptance by Interscope of the Master Recordings concerned and all documents and other materials required to be furnished to Interscope in connection with them. Without limiting the generality of the preceding sentence, no Master Recordings will be deemed Delivered and accepted until Interscope has received all of the related documentation required. Interscope will have the right to disapprove and reject any Master Recording which in Interscope's reasonable, good faith opinion, is patently offensive, constitutes an obscenity, violates any law, or infringes or violates the rights of any Person, or which might subject Interscope to liability or unfavorable regulatory action. A Master Recording will be considered satisfactory pursuant to the terms of paragraph 6 of the Agreement to which this Exhibit is Attached.

5.19.  "Top-line Record" - a Record released bearing the same Suggested Retail List Price as the majority (or plurality) of the Record releases in the same configuration then in initial release in Interscope's active catalog.  (For the purposes of the preceding sentence, a Record release will not be deemed in its initial release if it bears a Suggested Retail List Price lower than that which applied to it when it was first released by Interscope.)

5.20.  (a)  "Budget Record" - a Record, whether or not previously released, bearing a Suggested Retail List Price which is sixty-seven percent (67%) or less of the Suggested Retail List Price in the country concerned applicable to the Top-line Records in the same configuration (e.g., long-playing Album, two-disc long-playing Album, Twelve-Inch Single, analog tape cassette, compact disc, Digital Download Records, etc.) released by Interscope or its Licensees in the territory concerned.

(b)  "Mid-price Record" - a Record, whether or not previously released, bearing a Suggested Retail List Price in the country concerned in excess of sixty-seven percent (67%) and less than eighty percent (80%) of the Suggested Retail List Price applicable to the Top-line Record in the same configuration.

5.21.  "Multiple Record Set" - an Album which contains a sufficient number of Masters embodying Artist's Performances to comprise two (2) or more compact disc

23-Jun-99 01:37A

Records, or the equivalent, each of not less than thirty-six (36) (but for Spanish Albums thirty-two (32) minutes provided same contains six Sides of not less than 3 minutes each) minutes of playing time and each containing at least ten (10) different Compositions packaged as a single unit, or which, because of the number of Master Recordings embodied thereon or the playing time thereof, bears a Suggested Retail List Price which is greater than that of the majority of Interscope's then-current releases in that particular configuration. For purposes of the Recording Commitment hereunder and for computing the applicable Recording Fund or Advance, a Multiple Record Set accepted by Interscope shall be deemed only one (1) Album.

5.22. "Mechanical Royalties" - royalties payable to any Person for the right to reproduce and distribute copyrighted Compositions on Phonograph Records other than Audiovisual Records.

5.23. "Recording Costs" - all amounts representing direct expenses paid or incurred by Interscope in connection with the production of finished Master Recordings under this Agreement. Recording Costs include, without limitation all union scale payments required to be made to the Artist in connection with Recordings made hereunder, all costs of instrumental, vocal and other personnel specifically approved by Interscope for the recording of such Master Recordings, all other amounts required to be paid by Interscope pursuant to any applicable law or any collective bargaining agreement between Interscope and any union representing Persons who render services in connection with such Master Recordings, any penalties for late payments caused by your delay in submitting union contract forms (if applicable), invoices or other similar forms (which fees shall also be reimbursable by you upon demand), travel (excluding travel for Interscope personnel unless they are producing), rehearsal, and equipment rental and cartage expenses, advances to producers, transportation costs, hotel and living expenses approved by Interscope, studio and engineering charges in connection with Interscope's facilities and personnel or otherwise, all costs and expenses of obtaining rights to all samples of Master Recordings, selections and other materials embodied in Master Recordings hereunder (including, without limitation, all advances, license fees, attorneys' fees and clearing house fees), all costs of mastering, remastering, remixing and/or "sweetening" and all costs necessary to prepare Master Recordings for release on digital media. Recording Costs do not include the costs of producing metal parts, but include all studio and engineering charges or other costs incurred in preparing Master Recordings for the production of metal parts. (Metal parts include lacquer, copper, and other equivalent masters.)

5.24. "Special Packaging Costs" - costs incurred by Interscope in creating and producing Album covers, sleeves, and other packaging elements, in excess of Interscope's then-standard costs for our superstar artists for design of artwork (including expenses for reproduction rights), engraving, separations and then-standard packaging manufacturing costs. If a design submitted by you would result in Special Packaging Costs, Interscope will give you a reasonable opportunity to change the artwork to come within Interscope's then-standard costs for our superstar artists for design of artwork prior to incurring same.

5.25.   (a)   "New Medium" Records - Records (other than Audiovisual Records) in any software medium (including, without limitation, "digital audio tape", "digital compact cassette" and "Mini-Disc" and transmission directly into the home or "downloading", i.e., Digital Download Records) in which recorded music is not in general commercial distribution in the United States as of January 1, 1999.

(b)   "Standard" Records, units, etc. - Records other than New Medium Records and Audiovisual Records.

5.26.   "Covered Video" - an audiovisual work owned or controlled by Interscope, the soundtrack of which consists primarily of one (1) or more Master Recordings subject to this Agreement.

5.27.   "Featured Countries" - the United States, Mexico, Spain, Argentina, Chile and Brazil.

JUN-23-1999  01:20                                                    P.16/33



## MAXIMUM PERMITTED FREE GOODS

ARGENTINA
AUSTRALIA

AUSTRIA
BELGIUM
BRAZIL
CANADA

CHILE
CZECH REPUBLIC
DENMARK

FINLAND
FRANCE
GERMANY
HONG KONG
HUNGARY
ITALY
JAPAN
MALAYSIA
MEXICO
NETHERLANDS
NEW ZEALAND
NORWAY
PHILIPPINES
POLAND

PORTUGAL
RUSSIA
SINGAPORE
SLOVAKIA
SOUTH AFRICA
SOUTH KOREA
SPAIN
SWEDEN
SWITZERLAND
TAIWAN
THAILAND
UK

VENEZUELA



23-Jun-99 01:37A

JUN-23-1999  01:20                                                                                P.17/33

# SCHEDULE OF PUBLISHERS

EMI MUSIC PUBLISHING

23-Jun-99 01:37A